MANNING AND OTHERS *against The Executors of* MANNING.

*Sept.* 27th.

An executor, or trustee, is not entitled to *commissions*, or compensation for his services in the execution of his trust.
Executors, or trustees, are chargeable with *interest* on trust moneys applied to their own use.

THE testator, *James Manning*, made his will on the 29th of *November*, 1808, and died the next day, leaving a considerable real and personal estate. By the will, his executors were empowered to sell all his real estate, except that on *York Island*. The defendants all acted as executors, and sold the real and personal estate, and collected the proceeds, after paying debts; and from time to time paid over to the plaintiffs, who are the widow and children of the testator, various sums as part of the estate; but the plaintiffs charged that considerable moneys still remain in the hands of the defend-.

1815.

MANNING
v.
MANNING.

ants, unaccounted for; and, particularly, that each of them retains a sum under pretence of its being due for *commissions*, or as a compensation for personal services, in executing the will, &c.

The bill prayed for an account, and general relief.

The defendants, in their answer, state, that the testator was a merchant of extensive business, and had many outstanding debts, difficult to be collected ; and his children being infants, without a guardian to act for them, the defendants had a great deal of trouble in managing the estate and collecting the moneys, &c. That they had received, on account of the estate, 78,598 dollars and 25 cents, and had paid 77,024 dollars and 53 cents, leaving a balance of 1,573 dollars and 72 cents in their hands ; and that there are still some outstanding debts to be collected. That the real estate was dispersed in different states, and the charge was in their hands about four years. That the testator left the executors no legacy, or any compensation for their trouble ; and they submitted that they were justly entitled to, and ought to have, a *commission* of two and a half per cent., on 76,701 dollars, of the funds of the estate received and paid out by them; and the like commission on 51,782 dollars, part of the amount received by them. They admitted that *Jeremiah Manning*, and *Robert Manning*, two of the defendants, had, respectively, used part of the moneys received by them, for which, however, they allowed *interest* to the estate; but which, they think, ought not to be allowed. *William F. Manning* admitted that he retained in his hands 129 dollars and 26 cents, being *commissions*, of 5 per cent., for his services in taking charge of a farm in *New-Jersey*, owned by him and the testator jointly. *Jeremiah Manning* admitted that he retained in his hands 720 dollars and 15 cents, as a compensation for his services to *January*, 1813, besides the *interest* above mentioned, amounting to 420 dollars and 64 cents. *Robert Manning*, also, admitted, that he retained 613 dollars and 50 cents, besides the interest due from him of 116 dollars and

50 cents, which amount he claimed as a compensation for his services.

*Slosson*, for the plaintiffs. He cited *Robinson* v. *Pett*, 3 *P. Wms.* 249., and *Gould* v. *Fleetwood*, *id.* n. p. 251. *Chetham* v. *Audley*, 4 *Ves.* jun. 72. *Harvey* v. *Blakeman*, 5 *Ves.* jun. 696.

*Baldwin*, for the defendants. He cited *Bonithon* v. *Hockmore*, 1 *Vern.* 316. 4 *Ves.* 75. *Brown* v. *Lilton*, 1 *P. Wms.* 140. 1 *Pennington's N. J. Rep.* 44. 3 *Binney's Rep.* 557. 1 *Wash. Rep.* 250. *Ayliff* v. *Murray*, 2 *Atk.* 60. *Ellison* v. *Airey*, 1 *Ves.* 111. *Swinburne*, 860. 11 *Vin. Abr.* 483. 1 *Vernon*, 197. 1 *Bro. C. Rep.* 359. 12 *Ves.* 391. 13 *Ves.* 592. 2 *Atk.* 106. 151. 603. *Swinburne*, 154. 251. 7 *Ves.* 96, 97. *Toller's Law of Executors*, 324.

THE CHANCELLOR. The executors are called on to render an account of their trust; and they set up a claim to a commission of 5 per cent., as a compensation for their care and trouble in the management of the estate; and they, likewise, contend, that they ought not to account for interest on moneys belonging to the estate, and which they made use of for their private purposes.

1. The claim of an allowance has been pressed upon the court with much zeal, as if the denial of it would be extremely unjust, and as if this court was at liberty to deal with established rules just as it pleased. This very point was one that arose in the case of *Green* v. *Winter;** and it was, then, considered as a settled rule in the *English* chancery, that no such allowance was admissible, unless it rested upon contract, or was given by the will. The rule there must be the rule here; for I take this occasion to observe, that I consider myself bound by those principles, which were known and established as law in the courts of equity in

* *Ante*, p. 26.

*England*, at the time of the institution of this court; and I shall certainly not presume to strike into any new path, with visionary schemes of innovation and improvement; *via antiqua via est tuta*. It would, no doubt, be, at times, very convenient, and, perhaps, a cover for ignorance, or indolence, or prejudice, to disregard all *English* decisions as of no authority, and to set up as a standard my own notions of right and wrong. But I can do no such thing. I am called to the severer and more humble duty of laborious examination and study. It was Lord *Bacon* who laid it down as the duty of a judge to draw his learning from books, and not from his own head. This court ought to be as much bound as a court of law, by a course of decisions applicable to the case, and establishing a rule. As early as the time of Lord Keeper *Bridgman*, it was held that precedents were of authority; and that it would be " very strange and very ill" to disturb a rule in chancery which had been settled. (1 *Mod.* 307.) The system of equity principles, which has grown up and become matured in *England*, and chiefly since Lord *Nottingham* was appointed to the custody of the great seal, is a scientific system, being the result of the reason and labours of learned men for a succession of ages. It contains the most enlarged and liberal views of justice, with a mixture of positive and technical rules, founded in public policy, and indispensable in every municipal code. It is the duty of this court to apply the principles of this system to individual cases, as they may arise; and, by this means, endeavour to transplant and incorporate all that is applicable in that system into the body of our own judicial annals, by a series of decisions at home.

The Master of the Rolls, Sir *Joseph Jekyll*, disclaimed any discretionary power in the court, sometimes ignorantly imputed to it, to follow the private affections, or any arbitrary notions of abstract justice, instead of the established maxims of law and equity. Though proceedings in equity are said to be *secundum discretionem boni viri*, yet, when

it is asked, *Vir bonus est quis?* The answer is, *Qui consulta Patrum, qui Leges, Juraque servat;* (Sir *J. Jekyll,* in 2 *P. Wms.* 753. See also 3 *P. Wms.* 411.;) and it may be laid down as a certain truth, that the *English* system of equity jurisprudence forms an important and very essential branch of that "common law," which was recognised in the constitution of this state. If it were not so, this court would be a dangerous tribunal, with undefined discretion, and without either science or authority to guide it. The *English* decisions are, undoubtedly, the most authentic evidence of the *English* common law; and the dignity or independence of our courts is no more affected by adopting these decisions, than in adopting the *English* language; or than the independence of *France* or *Holland* is wounded by following, as they do, the civil code of the ancient *Romans.*

Our business, then, as questions arise, is to discover what rule, if any, has been established by the courts in this state, and if none, then what was the existing rule in the *English* system of equity at the commencement of our revolution. And while engaged in this inquiry, we are not to blind our eyes against human knowledge, but it is incumbent on us to examine the several authorities, whether they be ancient or modern, whether they be before or since the revolution, whether they be foreign or domestic, which may tend in any degree to ascertain, explain, or illustrate, the point under consideration. When we have been able to deduce from them, with sufficient precision, the true, genuine rule of equity, that rule becomes the law of the case, and the case, a precedent for the future.(*a*)

(*a*) In *Bond* v. *Hopkins,* (1 *Schoale* & *Lefroy,* 428, 429.) Lord *Redesdale* observed, "There are certain principles on which courts of equity act, which are very well settled. The cases which occur are various, but they are decided on fixed principles. Courts of equity have, in this respect, no more discretionary power than courts of law. They decide new cases, as they arise, by the principles on which former cases have been decided, and

1815.

MANNING
v.
MANNING.

With this explanation on the subject of cases, (and to which I have been led by the language of some decisions in this country,) I return to the point before me, and I think it is not to be denied that the law is *settled* against the claim of a trustee to compensation. The decisions have remained steady and uniform for a century and a half, and the rule applies not to executors merely, but equally to trustees of every description. The only unsettled point seems to be, whether even an agreement with the *cestuy que trust*, for an allowance made after the creation of the trust, or the death of the testator, would be recognised as binding. " I will not say," observes Lord *Hardwicke*, " that the court will set aside such an agreement, if fairly and openly made, though there is no instance where the court has confirmed such a bargain." A trust is regarded, in chancery, as a matter of honour and conscience, and undertaken with humane, or friendly, or charitable, and not with mercenary, views. It is not necessary to go through the cases at large, or repeat what I have said on a former occasion. A general reference to the authorities must be sufficient. (*How* v. *Godfrey, Rep. temp. Finch,* 361. *Hethersell* v. *Hales, Rep. in Ch.* vol. 2. p. 83. *Bonithon* v. *Hockmere,* 1 *Vern.* 316. *Scattergood* v. *Harrison, Moseley,* 128. *Robinson* v. *Pett,* 3 *P. Wms.* 248. *Gould* v. *Fleetwood,* n. *ib. Ayliffe* v. *Murray,* 2 *Atk.* 58. *The Charitable Corporation* v. *Sutton,* 2 *Atk.* 406. *In the matter of Annesley, Amb.* 78. *Ellison* v. *Airey,* 1 *Ves.* 111. *Chetham* v. *Lord Audley,* 4 *Ves.* 72. *Fearns* v. *Young,* 10 *Ves.* 184.)

The distinction attempted to be raised between a mere executor, and one partaking rather of the character of an agent or bailiff, is not applicable to the case. The distinction might, with equal or more propriety, have been made in

may thus illustrate or enlarge the operation of those principles ; but the principles are as fixed and certain as the principles on which the courts of common law proceed."

*How* v. *Godfrey & White*, which was one of the earliest cases, and in which the general rule was established by Lord *Nottingham* himself. The defendants in that case, were appointed by a nuncupative will to take care of the estate for the infant children of the testator, and they took out administration with the will annexed ; and by virtue thereof, and as guardians, they possessed themselves of the whole estate, real and personal. If the idea of acting as agent or bailiff, rather than as executor, was applicable to any case under a will, it would have been so to that, and yet the Chancellor rejected their demand of an allowance for their care and trouble. The same distinction was urged, and equally in vain, in *Robinson* v. *Pett*, where the services were alleged to be very extraordinary, but the party still acted under a trust created by will ; and it was in that case that Lord *Talbot* laid down the rule in very general and emphatic terms. He said it had long prevailed, and was a reasonable rule, and one which tended to prevent the trust estate from being loaded and eaten up by a charge voluntarily assumed. It is a rule founded in the same equitable policy of closing the door to temptation, abuse, and fraud, with that other rule forbidding a trustee to become a purchaser, for his own benefit, of the trust estate. And if the rule applied with more force and propriety to one kind of trust than another, I should think it was that of an executor who gives no security, and who is selected by reason of some special and sacred confidence, resulting from the ties of kindred or friendship, and charged by the testator, in his dying moments, with interests of the nearest human concern, and which he is on the eye of renouncing for ever. The request of the testator, in such cases, is the *supplication of a friend :*

> ———————— *Miseræ hoc tamen unum*
> *Exequere—mihi.*

It appears to be the practice in several of the *United*

1815.       *States*, to allow a commission of so much *per centum* to exe-
MANNING    cutors and other trustees. (1 *Wash. Rep.* 246.  4 *Hen. &*
v.         *Munf.* 415.  1 *Munf.* 150.  3 *Binney*, 457.) But this
MANNING.   practice cannot be received here as authority, however re-
spectable the source; for it is not founded upon any differ-
ent construction of the *English* law, but upon local usages or
statutes, which have confessedly changed the *English* rule.
I am not responsible for the justice of that rule. I only de-
clare the law as I find it to be settled; and if the rule was
admitted to be, according to the language of one of the
southern chancery cases, "a monstrous rule," I should not
feel myself at liberty to say, as that case does, "so far as I
can go, I shall blot it out for ever."(*a*)  It is the province of
the legislative, and not of the judicial power, to change the
law; and our constitution has auspiciously declared, that the
common law of *England* (in which I include, of course, the
equity system) "*shall continue the law of this state,* subject
to such alterations and provisions as the legislature of this
state shall, from time to time, make concerning the same."

Nor does the rule strike me as so very unjust, or singular
and extraordinary; for the acceptance of every trust is
voluntary and confidential; and a thousand duties are re-
quired of individuals, in relation to the concerns of others,
and particularly in respect to numerous institutions, partly
of a private and partly of a public nature, in which a just
indemnity is all that is expected and granted.  I should think
it could not have a very favourable influence on the pru-
dence and diligence of a trustee, were we to promote, by the
hopes of reward, a competition, or even a *desire*, for the pos-
session of private trusts, that relate to the moneyed concerns
of the helpless and infirm.  To allow wages or commissions
for every alleged service, how could we prevent abuse ? The
infant or the lunatic cannot watch their own interest.  *Quis*

(*a*) *Miller* v. *Beverley*, 4 *Henning* & *Munf. Virg. Rep.* 415—419. per
Chancellor *Taylor.*

*custodiet ipsos custodes?* The rule in question has a sanction in the wisdom of the *Roman* law, which, equally with ours, refused a compensation, and granted an indemnity to the trustee of the minor's estate. The maxim in that law was, that *lucrum facere ex pupilli tutela tutor non debet;* and the tutor or curator was entitled only to his reasonable and just expenses incurred in behalf of the estate, such as travelling charges, costs of suit, &c., unless a certain allowance was granted by the person by whom he was appointed. *Sumptuum, qui bona fide in tutelam, non qui in ipsos tutores fiunt ratio haberi solet: nisi ab eo, qui eum dat, certum salarium ei constitutum est. Item sumptus litis tutor reputabit, et viatica, si ex officio necesse habuit aliquo excurrere vel proficisci.* (*Dig.* 26. 7. 33. *Idem.* 26. 7. 58. *Idem.* 27. 3. 1. 9.) It is probable that this same principle, which we find in some, has been infused into the municipal law of most of the nations of *Europe,* because most of them have adopted the civil law. (*Domat,* b. 2. tit. *Tutors,* sect. 2. pl. 3. sect. 3. pl. 35. *Ersk. Inst.* b. 1. tit. 7. sect. 31, 32.)

The same rule was known in the early ages of the common law, and applied to the guardian in socage. He was entitled only to his allowance for his reasonable costs and expenses, when called to render an account of the guardianship of the estate of the ward. (*Litt.* sect. 123.) And this was the provision in the statute of *Marlbridge,* (52 *H.* III. c. 17.,) declaring the duties of the guardian in socage, *salvis ipsis custodibus rationabilibus misis suis.*

2. As to the next point, whether the executors shall be charged with interest on the moneys which they admit to have been applied by them to their own use, and on which they had, at one time, admitted themselves to be chargeable with interest, there does not appear to me to be room for a question either on reason or authority. If the executor applies the moneys of the estate to his own use, he ought to pay interest, because he ought not to make a gain out of the estate; and it is his duty to manage it for the exclusive

benefit of the *cestuy que trust.* It is sufficient to refer to the cases of *Ratcliffe* v. *Graves,* (1 *Vern.* 196.,) *Newton* v. *Bennet,* (1 *Bro.* 359.,) and *Piety* v. *Stace,* (4 *Ves.* 620.,) to show that this is a settled rule of the court.

I shall, accordingly, decree, that the defendants are not entitled to any commission, and that they must account for the interest which they have heretofore allowed to the estate; and that, as they have undertaken, in favour of their own private claim, to litigate with the plaintiffs upon these two points, and which have been long settled in the law, it is just that they should do it at their own expense, and be chargeable with the costs of this suit; and this is the practice in such cases. (1 *Bro.* 359. 3 *Bro.* 433. 1 *Ves.* jun. 294. 4 *Ves.* 620.)

Decree accordingly.