delivered the opinion of himself and Murphey, J., who sat for Henderson, J. It is impossible to read this will without wishing the objects of it may be lawfully accomplished, since their nature is so purely benevolent, and they promise to afford such extensive benefits to the part of the State where the trust is to be carried into execution. But this very circumstance admonishes a judge to be cautious in every step he takes; to recollect that his office is to (127) administer the law as he finds it, and not as he wishes it to be, and to arm himself with new resolution in a case so peculiarly calculated to enlist the judgment on the side of the affections.
The subject, too, is in a great measure new in our courts, and is acknowledged to be entangled with difficulties even in the country whence we derive our legal notions; so that it is not easy from the multitude of conflicting decisions to extract the true principle on which the case ought to be placed.
The bill is filed to attain an account and division of the real and personal estate of Moses Griffin, and to have his executors declared trustees for the complainants, who are the heirs at law and next of kin of the testator. The bill is demurred to, and the argument has involved many interesting and important topics towards the illustration of which numerous authorities have been adduced and commented on.
The principal objections to the will are that it tends to produce a perpetuity; that the objects of the trust are vague and indefinite, and that as it is discretionary with the executors whether they will fulfill the trusts or not, there is no one to call them to account. Hence it is alleged that the property ought to be given to the next of kin and the heirs.
It is deemed material to remark, in the first place, that the executors do not seek the aid of the court at present to establish the charity, whatever they may do in future, but this application is made by the heirs and next of kin to defeat the will, so that *Page 61 
if the trust be valid at law and the objects of it sufficiently certain it seems superfluous to inquire into the powers of the court in relation to charitable devises and bequests; for if it were conceded that a court of chancery in this State is invested with no such jurisdiction over such subjects, yet if the disposition of the will is valid at law, the demurrer must be sustained, and the executors left to manage the fund in such way as the law prescribes and under such protection as it affords. If the trust were unlawful the Court would decree the property (128) to the complainants as in the case of Craven's will; but if it be lawful and sufficiently definite to be carried into execution it cannot be subverted in this Court.
There is no principle of law which forbids the appropriation of property to charitable uses since the power of alienation was introduced. A devise to individual trustees by name, for any purpose, not made unlawful by the statutes of Mortmain, has ever been deemed valid since the statute of wills, independent of the 43 Eliz. The civil law was distinguished for the protection it afforded to such bequests, and the first decisions under the statute of wills were probably influenced by a like disposition in the courts. To maintain a charity expressly declared by the testator seems to follow naturally from the former power of the ordinary to apply a part of every man's personal estate to charity. White v. White, 1 Bro. C. C., 12;Maggridge v. Thackwell, 7 Ves., 36, 69. In Porter's Case, 1 Rep., 22, the devise was to the wife on condition that she should grant the lands for the maintenance forever of a free school which the testator had erected, and of alms-men and alms-women attached to it. By those who argued in support of the devise one reason given was that the statute of Hen. VIII avoids superstitious and not charitable uses. Another was, that if it extended to this it made the use and not the conveyance void. And the devise was sustained by the Court. The condition was held to be a lawful one and such as the trustee might execute. It was because the condition was not performed that the heir was permitted to enter. This case is commented on by the Chief Justice of the United States in the Baptist Association v.Hart, 4 Wheat., 35, and it is taken for granted that the trust was a lawful one and might have been performed.
In enumerating the trusts not executed by the statute of uses, Sanders, p. 62, puts this case: If a man enfeoff (129) two or three persons and their heirs in trust, and to the intent that the inhabitants of such a place should have a free school, or in trust to maintain poor children, this trust is not executed by the statute of 27 Hen. VIII, for the land must *Page 62 
remain in the trustees to answer the purposes of the trust, and therefore not a use executed by the statute. One reason for this construction is because a use cannot be limited to a parish or any indefinite multitude by a general name, it being no corporation and without any public allowance. But this limitation of the use is good as a trust. Another reason, because it is a rule in chancery that where lands are given to trustees in trust to pay the profits over the lands must continue in the trustee in order to perform the trust.
These two instances of valid trusts at law, where the objects of the trusts are not more certain, and in the last case less so than in that before us, show that the will is sustainable at law.
In Baptist Asso. v. Hart, 4 Wheaton, 35, the bequest was to the Baptist Association that for ordinary meets at Philadelphia annually for the education of youths of the Baptist denomination, and it was held that the association, not being incorporated at the testator's death, could not take the trust as a society. The Chief Justice observes, "The cestui que trust can be brought into being only by the selection of those who are named in the will to take the legacy in trust; and those who are named are incapable of taking it." In the case before us, on the contrary, the executors are capable of taking the estate in trust, and are therefore capable of selecting those who are to be benefited by it. If then the widow in Porter's case might lawfully grant the land for the maintenance forever of the free school and of alms-men and alms-women, and the feoffees in the case from Sanders might lawfully provide a free school or maintain (130) poor children, I cannot perceive any reason why the executors in this case may not purchase land, erect a school and select the poor children to be educated and bound out. The trust may be carried into complete execution by an act of incorporation, as was suggested in Porter's case; and by the same means also the objection may be obviated that there is no person to call the executors to account. This inconvenience, however, arises from the act of the testator himself, who may fairly be presumed to have known where he might safely confide so large a trust; and as he might have given the property absolutely to the executors, no reason is perceived why he might not invest them with discretionary powers for so beneficient an end.
It is true that a court of equity assumes a control over trusts in general, and if the objects be uncertain, will consider the property undisposed of for the benefit of the heirs and next of kin. But here the objects are distinct, viz, the education of poor children and the binding them out as apprentices. As all the poor children in that part of the country could not receive the *Page 63 
benefit of the fund, a discretion was necessarily confided to the executors to select such as stood most in need of that aid. Without so much discretion as this no charitable institution could ever have been established; for, though it might be possible for a testator to designate existing objects, how could he point out those hereafter to be admitted.
The devises and bequests are next objected to on the ground that they tend to a perpetuity. The meaning which the law annexes to this term is that of an estate tail so settled that it cannot be undone or made void. As when if all the parties who have interest join they cannot bar or pass the estate, but if, by the concurrence of all having the estate tail, it may be barred, it is not a perpetuity. It is in reference to estates tail that the word is used in the bill of rights, for there was no other estate that had a tendency that way. A condition not to alien, annexed to a fee simple, is void; and the rules relative to executory devises, by which their duration is limited, had (131) effectually checked their tendency to a perpetuity. In obedience to the declaration of the bill of rights and to the injunction in the Constitution the Legislature of 1784 abolished entails, giving as a reason that they tended to raise the wealth and importance of particular families, and to give them an undue influence in a republic. This shows plainly that they designed to prevent the accumulation of individual wealth, and did not contemplate the possibility of any evil likely to arise from the establishment of a permanent fund for charitable uses. The probable effect of this was the reverse of what they meant to guard against, as it promised to increase the equality of the republic. It would afford the means of instruction to those who could not otherwise procure them; it would diffuse knowledge and morality amongst that class of society which stands most in need of them, and by rendering them useful and efficient members add to the strength and happiness of community. Assuredly, then, property applied to these ends never entered into the common law motion of a perpetuity; otherwise the objection would have been taken in Porter's case and the many others to be found in the books where similar dispositions have been made. The common law has always been adverse to perpetuities, and it is acknowledged on all hands that executory devises, on account of their tendency that way, are not the legitimate offspring of it but a privilege gradually insinuated into its system. The opposition to mortmain did not arise from the mischiefs likely to ensue from the stagnation of property, but from the loss occasioned to the barons of the profits of their tenure. It is true that one of the last mortmain acts in England recites this as an *Page 64 
evil, but that proves that it was not an inherent objection to such dispositions in point of law, otherwise they would not have subsisted for so long a period. I am thus led to conclude that a perpetuity which the law would deem void must be an (132) estate so settled for private uses that by the very terms of its creations there is no potestas alienandi in the owner. There is no such restraint imposed upon these executors. They, like other trustees, may sell for a valuable consideration, but whether the purchaser can acquire such a title as will prevail against the cestui quetrust will depend upon his having notice — an incidental circumstance wholly independent of the right of selling.
The next inquiry is whether a court of equity in this State has jurisdiction of the subject. At the period of the first settlement of this State, then a colony, the chancery in England was in the regular exercise of jurisdiction over charities under the 43 Eliz. A similar court was established here by the Lords Proprietors under the general powers given them by the charter. It was held by the Governor and council and continued until the year 1777, when the separation from the mother country took place. The following year the Legislature declared all such parts of the common law to be in force as were heretofore in force and use within this territory, or so much as is not inconsistent with the independence of the State. Under a similar provision in the laws of New York Chancellor Kent thought the equity system was of course included. Manning v. Manning, 1 Johns. Ch., 535. From the Revolution to the year 1782 there was a suspension of equitable remedies, and sometimes of legal ones, from the courts of justice being shut up. Equitable rights continued to subsist notwithstanding, and in 1782 courts of equity were established with all the powers and authorities that the former court of chancery used and exercised and that are properly and rightfully incident to such a court, agreeably to the laws in force in the State, and not inconsistent with the Constitution. That the cognizance of charitable devises and bequests was taken by the chancery in England, and that it was a power "rightfully incident" to such a court at the date of the charter, is shown by the adjudged cases; whether the court of (133) chancery in this State actually exercised a similar jurisdiction there are now no means of ascertaining.
The objection in this case is founded on the peculiar nature of the subject as it is viewed by the laws of England. It is laid down in the books that the king, as parens patriae, has the general superintendence of all charities not regulated by charter, which he exercises by the keeper of his conscience, the chancellor; *Page 65 
and therefore the Attorney-General, at the relation of some informant, where it is necessary, files ex officio an information in the court of chancery to have the charity properly established and applied. 3 Bl. Com., 427; 2 Fonb. Eq., b. 3, c. 1. It is also said that the jurisdiction thus established does not belong to the court of chancery as a court of equity, but as administering the prerogatives and duties of the crown; and that the duties vested in the chancellor by the statute of Elizabeth are personal and not in his ordinary or extraordinary jurisdiction in chancery; the same in fact which he exercises with respect to idiots and lunatics. Admitting this to be so in the broadest terms it does not, to my mind, present any real difficulty to the like power being exercised here. It opens a wide field of investigation, which I have reflected upon, but which I do not think it essential to enter into. The short ground upon which I should place it is that upon the Revolution the political rights and duties of the king devolved upon the people of this State in their sovereign capacity. That they, by their representatives, had a right to deposit the exercise of this power where they pleased, and that they have placed it in the hands of the courts of equity. Whether this be a correct view or not does not affect the principle of my opinion in this case, because I think that where there is a trust and a trustee with some general or specific objects pointed out, or trustees for general or indefinite charity, a court of equity may, as a matter of trust, take cognizance of it in virtue of its ordinary jurisdiction. This position is maintained by the authorities quoted in a learned note to the appendix of (134) the fourth volume of Wheaton's Reports, which cases I have examined as far as I have had access to them — some in the Reports and others in abridgements. The cases further show that in indefinite trusts or trusts where some general objects are pointed out the distinction most acted upon is that in a general indefinite purpose, not fixing itself upon any object, the disposition is in the king by sign manual. But where the execution is to be by a trustee, with general or some objects pointed out, the administration of the trust will be taken by the court of chancery, either as delegate of the crown or as a court of equity, and managed under a scheme reported by a master and approved by the Court. 7 Ves., 36, 86; 1 Merir., 55; 14 Ves., 364; 15 Ves., 231; 17 Ves., 371; 16 Ves., 206.
I am consequently of opinion that the demurrer be sustained and the bill be dismissed.