Matter of the Judicial Settlement of the Account of THE FARMERS' LOAN AND TRUST COMPANY, as Temporary Administrator of the Goods, Chattels and Credits Which Were of EDWIN O. BRINCKERHOFF, Deceased, and of the Account of THE FARMERS' LOAN AND TRUST COMPANY, as Administrator with the Will Annexed of the Goods, Chattels and Credits Which Were of EDWIN O. BRINCKERHOFF, Deceased.

(Surrogate's Court, New York County, March, 1917.)

Terms — technical — meaning of "hotch-pot "— collatio bonorum.
Executors and administrators — accounting — advancements — wills — Supreme Court — jurisdiction.

"Hotch-pot" is a technical term in the common law. It is often used in later law to describe what in old customs and in equity and in Roman law is known as collation or " *collatio bonorum.*"

> Where, upon the judicial settlement of the accounts of the administrators of the estate of one who had been judicially declared to be an incompetent after he made his will, it appears that by orders of the Supreme Court certain sums had been directed to be advanced in the lifetime of decedent to his putative heirs at law and next of kin towards their maintenance and support, but such orders failed to conform to precedent by directing the collation of the advances, the surrogate is authorized to infer that the orders of the Supreme Court intend that the principle of *collatio bonorum* shall be applied in the Surrogate's Court upon the judicial settlement and distribution of the estate.
>
> While the surrogate is without power to pass on the validity of said orders he has jurisdiction to give them a construction consistent with precedent and equity.

PROCEEDING upon the judicial settlement of the account of a testamentary trustee and as administrator with the will annexed.

Geller, Rolston & Horan, for temporary administrator and administrator with the will annexed.

Ezekiel Fixman, for Daniel D. Brinckerhoff and others.

Fletcher, Sillcocks & Leahy, for Julia M. Harrison.

Charles W. Booth, for William N. Barlow and another.

Edward F. Moran, for Julia M. Daniels and others.

Cadwalader, Wickersham & Taft, for New York Association for Improving the Condition of the Poor.

Matthew C. Fleming, for American Female Guardian Society and Home for the Friendless.

Stanley W. Dexter, for Five Points House of Industry.

Surrogate's Court, New York County, March, 1917. [Vol. 99.

Jacob H. Shaffer, for Five Points Mission.

Omar Powell, for Daniel L. Cady.

Charles Caldwell, for L. Bell Caldwell.

Samuel L. Gross, for Charles Ver Nooy.

FOWLER, S. From the stipulation filed in the cause it appears that Edwin O. Brinckerhoff, now deceased, in his lifetime was judicially declared an incompetent person on the 23d day of February, 1877, and that he was thereafter and until his death confined in the Bloomingdale Insane Asylum, at White Plains, N. Y. By an order of the Court of Common Pleas for the city and county of New York, dated December 7, 1882, Nathaniel Jarvis, Jr., was appointed committee of his person and estate. By an order of the Supreme Court on the 30th day of March, 1891, Mr. Jarvis was permitted to resign as such committee, and Thomas S. Ollive was appointed committee of the person and estate, and acted as such until the death of the said Edwin O. Brinckerhoff on the 7th day of December, 1915, a resident of the county of New York. Edwin O. Brinckerhoff left a will dated the 2d day of October, 1875. It appears that objections to the probate of the will were filed by various next of kin, but thereafter and by stipulation the objections to probate were withdrawn and all parties consented to the probate of the will, which was accordingly duly admitted to probate on the 7th of March, 1916. The testator was unmarried and left no issue. He left surviving him only the following next of kin: Julia M. Harrison, a sister of the half blood; Daniel D. Brinckerhoff, a brother of the half blood; Elvina D. Clark, a sister of the half blood; Frederick W. Cooper, a son of Angeline Cooper, a deceased sister of the whole blood; Louise B. Arm-

strong, a daughter of Mary Frances Nesbitt, a deceased sister of the whole blood; William N. Barlow (also known as William Nathan Nash), a son of Emma Nesbitt Nash Barlow, a deceased daughter of Mary Frances Nesbitt, a deceased sister of the whole blood; Robert B. Brown, Julia M. Daniels and Stuart H. Brown, children of Ethelinda R. Brown, a deceased sister of the half blood.

By the will of the testator, Edwin O. Brinckerhoff, one-half of his residuary estate was given to a friend, Edwin R. Livermore, who predeceased the testator, and such one-half of the residuary estate upon the death of the testator passed under the laws of intestacy to the next of kin of Edwin O. Brinckerhoff. The will bequeathed the remaining one-half of the estate to four charitable corporations named in the will. In order to avoid a contest an agreement in writing was entered into by and between all the parties in interest, bearing date February 14, 1916, whereby it was in substance provided that the objections filed to the probate of the will should be withdrawn and that all parties should unite in procuring the probate of the will, which was done. It was further provided in the said agreement in substance that the one-half share of the charitable corporations in the residuary estate should be reduced to one-quarter, the remaining one-quarter so bequeathed to the charitable corporations to be distributed to the next of kin in the same manner as if the testator had died intestate with reference thereto.

It is also stipulated in the submission of facts that during the lifetime of the testator and while he was confined in the asylum several of the next of kin of Edwin O. Brinckerhoff applied to the Supreme Court of the county of New York and obtained therefrom orders directing the committee to pay out of the surplus income of the incompetent person various

Surrogate's Court, New York County, March, 1917.    [Vol. 99.

amounts towards their maintenance and support. Copies of such orders are annexed to the agreed statement of facts submitted in evidence. The amounts advanced pursuant to such orders are as follows: Evelina D. Clark, $7,818.33; Louise B. Armstrong, $4,950; Frederick W. Cooper, $4,524.17; Daniel D. Brinckerhoff, $1,100; Julia M. Harrison, $2,325; Angelina Cooper, $2,450. The Supreme Court also allowed, it seems, $210.36 out of the estate of Edwin O. Brinckerhoff for the funeral expenses of said Angelina Cooper. Angelina Cooper predeceased the testator and was not one of the next of kin, and her estate is not now entitled to take any part of the estate of Edwin O. Brinckerhoff.

On the judicial settlement of the account of the Farmers' Loan and Trust Company as the temporary administrator of the estate and as administrator with the will annexed of the above named testator the question arises, What is the proper method of distribution, taking into consideration the sums drawn from the estate of Edwin O. Brinckerhoff by the above named parties pursuant to the various orders of the Supreme Court? The accountant proposes to arrive at the proper distribution by throwing the fund into " hotchpot," as they term it, so that next of kin not having participated in the allowances will receive their shares without reference to any deduction made pursuant to the orders of the Supreme Court. The accountant would, in other words, formally treat the sums advanced by the direction of the Supreme Court as still a part of the estate of Edwin O. Brinckerhoff. Objection is made to this method of distribution by those profiting by the orders of the Supreme Court. Objectants contend that the proposal of accountant that these sums shall be treated as advancements or deducted, or in any way set off, is contrary to law.

The accountant is indifferent about the result, and the real contention before me is between those of the next of kin profiting by the orders of the Supreme Court and those not so profiting.

Before considering the effect of the orders of the Supreme Court, let me consider for a moment the contention that "hotch-pot" governs here. "Hotch-pot" is a technical term in the common law. It is true, as I shall hereafter explain, that "hotch-pot" is some times used in modern decisions in a secondary sense or as the equivalent of *"collatio bonorum."* This metaphorical use of technical terms is open to objection. When a contention is made that "hotch-pot" governs a succession, it is necessary to consider what precisely is meant. It will not do to be vague in this court about principles governing successions to estates. It is true that "hotch-pot" is sometimes defined by common-law writers as the blending and mixing property of different persons "in order to divide it equally." But this is not a definition of "hotch-pot" but of the effect of "hotch-pot." "Hotch-pot" itself denotes in law but one single application of a principle.

While the term "hotch-pot" is found in recognized use in England as early as 1292, there was but a single instance at common law where "hotch-pot" was applied. If fee simple lands descended to coparceners and one daughter had previously taken an estate in frank marriage out of the fee simple, she must surrender or bring back her part so given on her marriage or else she was excluded from any further share in the fee simple. This alone was "hotch-pot" at common law. This single instance is certainly a slender foundation for the claim that "hotch-pot" governs in this state at present in successions to personal property. There was, however, in the old law a like principle having a totally different origin and application. In

Surrogate's Court, New York County, March, 1917.    [Vol. 99.

successions to personal property in London and in the province of York, before the enactment of the first Statute of Distributions, in the reign of Charles II, any pecuniary advancement to children by their father excluded them from sharing in the surplus of the father's estate unless they brought the advancement into the reckoning. This local custom, quite distinct from the other " hotch-pot," was sometimes denominated " hotch-pot." But " hotch-pot " *strictissimi juris* it was not. We may search the common-law books from end to end, and there will be found no other instance of " hotch-pot " in the country from which by constitutional limitation we derive our common law. There is consequently no foundation for the present assertion that in any other instances " hotch-pot " is a principle of the common-law application to successions to personal property in this state.

In the records of the province of New York prior to independence I have never been able to find any succession where the principle of " hotch-pot " was applied. I think we may safely conclude that in our local common law " hotch-pot " was only applicable before the year 1774 to coparceners where one had taken in frank marriage. That the principle of the customary collation, sometimes called " hotch-pot " was adopted *sub modo* in our first Statute of Distributions I shall presently indicate. If there were no similar and other principle here relevant, the Statute of Distributions in terms would exclude the application of " hotch-pot " to this case now before me.

The Statute of Distributions (22 & 23 Charles II, chaps. 10, 11), which even at present governs successions *ab intestato* in this state, has a singular history. The English statute being passed in 1683 did not *ex proprio vigore* extend to New York. It was no doubt acted on in New York, but when some doubts arose

about its extension to New York it was expressly re-enacted by our legislature in the year 1774. Laws of 1774, chap. XI. After independence it was constantly re-enacted, either literally or in substance, in the various revisions of our statutes down to and including the Revised Statutes. Laws of 1787, chap. 38; 1 K. & R. 535, 538; 1 R. L. 311; 2 R. S. 96, 87. Sections 98, 99 of the Decedent Estate Law furnish only the latest re-enactment of the statute 22 and 23 Charles II, chapter 10, as I have had occasion to point out in this court in a case affirmed by the Court of Appeals. The English Statute of Distributions contained a provision in relation to advancements no doubt founded on the old customs of London and York. This part of the statute relative to advancements has been sometimes ascribed to *collatio bonorum* of the civilians. It is not improbable that the customs of York and London, strong Roman settlements, may have preserved traditions of the Roman administration, but the weight of authority is that the statute itself was founded on the customs indicated. Its subsequent construction certainly proceeded on that basis. Section 99 of the Decedent Estate Law regulating advancements is the present form of the Statute of Distributions, and it is now invoked on this proceeding. It has received practically the same construction as the old Statute of Distributions. It has no application to advances by others than parents. Consequently it furnishes no rule binding in this proceeding. There is in short no statute which now governs this matter in so far as the sums paid to the recipients under the orders of the Supreme Court are concerned.

If there is any authority for the application of the rule known as collation, or " *collatio bonorum*," to this proceeding it is to be found either in the system of equity made by the Constitution, according to *Manning*

Surrogate's Court, New York County, March, 1917.    [Vol. 99.

v. *Manning*, 1 Johns. Ch. 527, a constituent part of our common law, or else in the common law specially applicable to this court. It becomes necessary therefore to consider, in the first instance, whether chancery affords any precedent for adjusting the equities between the parties to this proceeding and, if so, whether the surrogate is by statute yet become enough of a chancellor to be authorized to apply it. While I have always maintained the jurisdiction and powers clearly conferred on the surrogates, I have never erred by extending the equitable jurisdiction of the surrogate beyond the statutory authority. My own construction of the maxim, "*ampliare jurisdictionem boni judicis*" does not mean that the surrogate is justified in reaching out for equitable powers beyond the clear warrant of law in order to meet the exigencies of a particular case rightfully before him.

Before considering the equitable rules of our own system, if any, applicable to this proceeding, let me advert to the doctrine of *collatio bonorum*, because if there are no equitable rules of our own system applicable, then we may be authorized by the common law annexed to this court to appeal to the civil law. *Collatio bonorum* in the civil law indicates the obligation which that system of jurisprudence ordinarily imposes on the successors to an inheritance to return to the common inheritance gifts which they received from the " estate-leaver " during his lifetime to the extent that they were enriched thereby. Ulpian, 28, 4; D., 37, 6–8; Code, 6, 20; Novel, 18, c. 6; Novel, 97, c. 6. *Collatio bonorum* applied to successions either *ex testamento* or *ab intestato*. It will be observed that *collatio bonorum* applies to all unjust enrichments even if there was not an express understanding with the " estate-leaver " that on the final succession there should be *collatio bonorum*. It applies whether there was or was

not a testament or, in other words, it does not apply to intestate successions only. If, however, the "estate-leaver" expressly exonerated the taker from *collatio,* the rule did not apply unless such exoneration violated some principle of *legitim.*

It will next be considered whether equity in our system had a jurisdiction like *collatio bonorum* to compel the recipients under the orders of the Supreme Court to bring back the sums paid them. That our equity in its doctrines of advancements, offset, ademption and administration early adapted Roman law principles in substance admits of no doubt. It is true that modern lord chancellors sometimes went further than the civil law, as intimated in *Ellison* v. *Cookson,* 1 Ves. Jr. 100, 104, but in most instances they treated the civil law as a recognized ultimate source of law in chancery matters in case there was no superior local or modern source of law. If the record of the judgments of the clerical chancellors were extant I am persuaded that it would disclose that the civil law of *collatio bonorum* was not only argumentatively authoritative in our equity, but absolutely binding and a source of law. Mr. Justice Story always recognized the force of the civil law in equity, a recognition which helped to give him his admitted supremacy over most of the English chancellors in equitable matters. *E. g.,* Eq. Jurisp. §§ 635, 636, 1440. Modern investigators agree with Story on this point. See citations in Scrutton.Rom. Law and Law of England, chap. 11; Spence Eq. Jurisd. and Kirley Hist. Eq. These opinions of competent commentators are of course valuable only when based on decided causes alone of authority in our courts of justice. That the cases generally support the deductions of the commentators in this instance I do think the fact.

That courts of equity would, in an administrative suit, quite independently of "hotch-pot" or the Statute of

Distributions, compel the recipients of advances to bring back the sums advanced into the account on a general distribution there can be no doubt. *Edwards* v. *Freeman,* 2 P. Wms. 435; *Phiney* v. *Phiney,* (1708) 2 Vern. 638. In a note to this last case an editor of a century ago states: " It is apprehended a gift of personalty in the lifetime of the intestate to his heir at law must be brought by the heir in all similar cases into ' hotch-pot.' " This is a mere statement of a general principle in equity. He obviously means by " hotch-pot " *collatio bonorum.*

Whether such decisions in equity, and they are many, were founded on the civil law relative to *collatio bonorum* or reached independently by our chancellors is of no consequence. The point is that it was a general doctrine of our courts of equity that sums advanced to those entitled to the succession could be adjusted on equitable principles in the distribution of estates. That the surrogate has now succeeded to the equitable powers in accounting proceedings to adjust the equities of the parties is clear. The statute and decisions both so affirm.

But if equity in our system could not compel those advanced in this instance to bring their advances into the general account on a distribution, the common law of this court, as adopted by the Constitution, now enables the surrogate to decree a *collatio bonorum.* It will be remembered that even in states as far apart as Massachusetts and Nebraska the law regulating the former English courts of probate has been held applicable. In this old state this is expressly so both by legislation and custom. Consequently, if there is now no principle of our own law, common or statute, applicable, the civil law controls in this court, and this is a proper instance to apply it. What is *collatio bonorum* of the civil law I have indicated above. But it is

quite unnecessary here to rely on this point, and it is therefore not elaborated.

The tenor and effect of the orders of the various justices of the Supreme Court awarding sums out of the estate of Edwin O. Brinckerhoff, an incompetent person, must be considered in this proceding before any determination can be reached.  The surrogate has no jurisdiction which would enable him to vary these orders of the court of general jurisdiction in law and equity known as the Supreme Court.  In legal theory any Supreme Court justice may look into the validity of any surrogate's order before him judicially (*Matter of Pye,* 21 App. Div. 266); but the converse proposition is by no means true.  After the reign of Henry VIII any justice of the King's Bench, no matter who, could inhibit the wisest of the civilians presiding in the courts at Doctors' Commons.  On the other hand, the judges at Doctors' Commons could not question the validity of the orders of the common-law courts.  The singular tendency of old legal institutions to perpetuate themselves under any successor government displays itself in the legislation of this state continuing the Supreme Court and the revised courts of probates, now known as courts of the surrogates.

But while the surrogate cannot in this proceeding pass on the validity of any orders of the Supreme Court the meaning and effect of its orders, awarding sums out of the estate of the incompetent, which is now the subject of this accounting, can and must be considered.  Copies of the orders are annexed to the agreed stipulation of fact submitted to the surrogate. Such orders of the Supreme Court, even if jurisdictional, contain no direction on their face that the sums granted to the various heirs or next of kin should be brought into the reckoning on the final distribution of Mr. Brinckerhoff's estate.  In other words, such

Surrogate's Court, New York County, March, 1917. [Vol. 99.

orders fail to conform to the practice of the Court of Chancery both of England and of this state.

Whether the justices of the Supreme Court inherited the jurisdiction of the lord high chancellor to make any such orders at all was a question perhaps for their learned consideration. The learned justices may have overlooked, when making such orders, that the courts of equity of this state inherited only the equity jurisdiction of the lord high chancellor, and not the prerogative jurisdiction exercised by the lord chancellor as the representative and delegate of the king. By the statute " *De Praerogitiva Regis* " the care and custody of lunatics and their estates belonged to the crown, as *parens patriæ,* and the lord chancellor, not as the head of the Court of Chancery, but as an officer of state, was by delegation the official guardian of lunatics, at least after the sixteenth century. The lord chancellor's power to make allowances out of lunatics' estates was not, I think, a judicial power, or, if it was, it certainly rested on very different foundations from that of the Supreme Court justices of this state. That the power of the lord chancellor over lunatics and estates of lunatics was not judicial may be detected from the practice on appeals. If the lord chancellor had acted as a court of equity appeals from his action would have been to the House of Lords, whereas appeals in lunacy always lay to the king in council. But I admit that this question whether his power is judicial or ministerial is rather an obscure point, and there is some language in the old books which might lead to either conclusion. If the power of the lord chancellor was, as I think, a delegation from the king as *parens patriæ,* and not a judicial power, it did not vest in the chancellors of New York at any time, and could not pass to the Supreme Court. It has always been held in this state that the prerogative powers of

the lord chancellor as the immediate representative of the crown do not vest in the justices of the Supreme Court of this state. *Bascom* v. *Albertson,* 34 N. Y. 584, 590, 592; *Holland* v. *Alcock,* 108 id. 312, 330. But passing this point, important at another time and in another place, let us proceed to consider the practice of courts of equity in making orders for payments to putative heirs out of the estates of lunatics.

In the English Chancery, where the power to make allowances was certainly more extensive, the orders made for allowances out of the estates of lunatics always expressly provided for a *collatio bonorum,* or, in other words, that the sums advanced under such orders should be brought into the final reckoning on the succession of those advanced to the estate of the lunatics. In *Matter of Frost,* 39 L. J. ch. 808, where advances were made out of the estate of a lunatic, it was said: " Of course all sums paid under this order will be brought into account when the shares come to be ascertained." This seems to have been the invariable doctrine in the English Chancery. The sums so advanced must, in other words, be brought into the account of the succession on the principle of *collatio bonorum.* When we come to the chancery practice under our state government after 1775, we find that Chancellor Walworth said that he invariably required the adult children advanced out of the estate of lunatics to give a stipulation that the amounts advanced to them should be brought into " hotch-pot " upon the death of the lunatics. *Matter of Willoughby,* 11 Paige ch. 259. This, it will be observed, was in precise accord with the English practice in Chancery. I have noticed before that " hotch-pot " is often used untechnically for " *collatio bonorum* " and as meaning the same thing. Chancellor Walworth used " hotch-pot " in the sense of collation. In the making of such orders

Surrogate's Court, New York County, March, 1917.   [Vol. 99.

for allowances out of the estates of lunatics, I infer that Chancellor Walworth, from his practice of granting such orders, assumed that his power was a judicial power, and he followed Lord Chancellor Eldon in his reasons for the granting of such orders. Lord Eldon assigned as a reason: "That the court would not refuse to do for the lunatic that which it is probable the lunatic himself would have done." *Matter of Whitbread,* 2 Meriv. 99. Any other doctrine would, we must concede, be highly inconvenient in practice, especially where a lunatic has children or a wife dependent on him. The action of that really distinguished chancellor, Chancellor Walworth, in granting any such allowances was perhaps a sufficient precedent for the Supreme Court justices to make allowances out of lunatics' estates, although the real point of doubt seems to have been assumed by Chancellor Walworth or passed by him *sub silentio.* It would certainly have proved inconvenient had Chancellor Walworth denied his power to direct any such advances or allowances out of the estates of lunatics.

This brings me to an important question on the proper construction of the orders of their honors in the Supreme Court, *i. e.,* although such orders failed to conform to the practice in equity, is not a direction for *collatio bonorum* to be implied from the orders themselves? The learned justices in the Supreme Court, I assume, did not mean to give the property of the lunatic absolutely away, in disregard of all established practice or principle. They would have no right to arrogate to themselves any such power. I assume that they did not. They doubtless intended that the advances to those entitled to share in the succession should be on the usual terms; that is to say, that the adult beneficiaries advanced should bring their advances into the final reckoning of the lunatic's

estate. It is my understanding of the effect of the orders of their honors in the Supreme Court that such orders intend, and must be taken to intend, that the sums advanced under such orders to the adult persons sharing in the succession should be brought into the final distribution on the principles of *collatio bonorum* and in conformity with the established practice. This construction might, I think, be supported also on the equitable doctrine of implied trusts. Any misapplication or unjust enrichment out of trust funds always implies an obligation by operation of law that the recipient of the funds of another will do what equity requires in order to retain them. But I will not, from various considerations, advance this last as an additional reason for my construction of the orders of the Supreme Court as really orders for *collatio bonorum*. So to do would suggest too many points open to discussion.

The surrogate has now been at some pains to show that " hotch-pot " is a technical term of limited application in our law. To some extent " hotch-pot " is now incorporated in our present Statute of Distributions. Neither the Statute of Distributions nor " hotch-pot " applies to the advances in question in this proceeding. It has been shown that equity has, however, jurisdiction to direct that such advances as those here in question should be brought into the account on the final distribution of the lunatic's estate or that part of it which passes as if *ab intestato*. It has also been held that the surrogate is now competent in proceedings of this kind to decree equity. It has also been intimated that " *collatio bonorum* " is a part of the common law of this court in proceedings of this character for distribution, and consequently that if the jurisdiction of courts of equity is in any way defective the principle of *collatio bonorum* is here

applicable. But this point is not essential to the decision, because there is not much difference in principle between "hotch-pot," the equitable doctrine of advancements, or *collatio bonorum*. The term "hotch-pot" is often used for all of them, a use which tends to some confusion of principle.

I am unable to find any adjudication of this state which denies to equity the right to decree a *collatio bonorum* in a proper case. Our cases on the Statute of Distributions do hold that the statute has no application to advances by those who die testate or partly testate or to advances made to others than to children. There is nothing new about this. It was so held under both the old Statute of Distributions (22 & 23 Charles II, chap. 10), and the custom of London on which this part of the old statute was founded. *Hedges* v. *Hedges*, Finch Prec. chap. 269; *Northey* v. *Strange*, 1 P. Wms. 340; *Hume* v. *Edwards*, 3 Atkyns, 450; Equity Cas. Abridged, 262, Customs of London. The cases in this state do not hold and cannot hold, as I understand it, that equity cannot decree that sums advanced shall be brought in a proper case into the final account on distributions other than those enumerated in the Statute of Distributions. To so hold would extend the operation of the Statute of Distributions in a most unwarranted manner and contradict the whole course of equity.

In view of what has been said it is decreed that the sums advanced under the orders of the Supreme Court shall be adjudged in this proceeding as advances where those so advanced are entitled to share in the distribution. The sums advanced to Angelina Cooper cannot be so adjusted as she is not entitled to share in the distribution. This is so held both in equity and in the Roman law relating to *collatio bonorum*. The advances to be collated must be taken at their face

value at the time they were received. No interest is chargeable thereon. The doctrines relating to charging interest have no application to collation. This is so both by the common law and the civil law.

One other point is raised in this accounting. The New York Association for Improving the Condition of the Poor, a charitable corporation, objects that it is not exonerated from any share of the federal income tax. This objection is in general well founded, but it seems that the accountant has not attempted to make the association bear any part of the income tax accrued since the date of the death of the testator. Under the federal law income tax due is assessed against an executor as a debt of the estate. The accountant has only charged the estate for the income tax paid for the year before the testator's death. That is proper, and it should be paid by the accountant out of the general funds of the estate. This objection should, I think, be overruled as to the amount so paid, although sustained in principle. Settle decree accordingly, with leave to apply on the settlement for any further directions desired.

Decreed accordingly.