In the Matter of the Application of OLIVE BUTLER ROCKHILL for Allowance Out of Surplus Income of Estate of IDA A. FLAGLER, an Incompetent Person.*

Supreme Court, New York County, October 27, 1927.

**Insane persons — application by relative for allowance out of surplus income of incompetent — facts do not justify allowance.**

This is an application by a second cousin of the incompetent for an allowance out of the surplus income of the incompetent. The petitioner is not in needy circumstances, having an equity in a house and lot worth several thousand dollars. Furthermore her two married daughters have each offered to take care of her and she has a brother who is wealthy. The only personal contact shown to have ever existed between the petitioner and the incompetent was nearly fifty years ago when on three successive summers the incompetent took her mother to the home of petitioner's mother for a vacation and later returned for her.

The evidence is not clear and convicing that the incompetent would if she were still competent be apt to contribute to petitioner. The application is denied.

APPLICATION for allowance out of surplus income of estate of an incompetent person.

*Robert J. Mahon*, for the petitioner.

*Joseph V. Mitchell*, special guardian, for incompetent.

*Delancey Nicoll* [*Gerald Donovan* of counsel], for committee of the property.

*Gerald Donovan*, for committee of the person.

*Agar, Ely & Fulton* [*Alfred Ely* of counsel], for next of kin.

GLENNON, J. Report of Referee I. Maurice Wormser confirmed. The report of the referee was in full as follows:

By a petition, verified on the 28th day of February, 1927, Olive Butler Rockhill, claiming to be a first cousin once removed (colloquially termed second cousin) of Ida A. Flagler, an incompetent person, makes application to this honorable court for an allowance for her support and maintenance out of the large surplus income of the incompetent. There have been a number of such applications in connection with this estate, some of which have been granted, and one of which was recently refused. (*Matter of Flagler* [*Smith*],

---

* See, also, 126 Misc. 764, and 130 id. 375, 554.

N. Y. L. J. June 1, 1927.) The present application is vigorously opposed by the committee of the property of the incompetent, as well as by the presumptive next of kin of the incompetent. The special guardian appointed by the court to protect the interests of the incompetent, however, recommends that an allowance of $100 per month should be granted.

By order of this court, dated August 4, 1899, Mrs. Ida A. Flagler was adjudged an incompetent, since which date she has been at all times and still is incompetent, and there is no reasonable prospect of her recovery. She is at present seventy-nine years of age, no will has been found among her papers or records, and none is known to exist. The husband of the incompetent is dead. Her only next of kin are a brother, now over eighty years of age, two nephews, and a grandniece, all of whom have been recognized as such next of kin by this court, and from time to time various orders of this court have been entered allowing said next of kin various annual allowances out of the surplus income of the estate of the incompetent.

The estate of the incompetent, according to the last annual accounting of the committee of the property, covering the period January 12, 1926, to January 12, 1927, shows a balance on hand as of the latter date of $11,377,169.63, yielding a gross income for the said year of $477,257.59. It is undenied that the excess of income over all payments made for the maintenance, support and care of the incompetent, the administration of her estate, and allowances to various relatives of the incompetent, amounts to an annual balance of over $100,000.

The petitioner is not related to the incompetent within the degree which would make the incompetent liable for her support, nor is she one of the presumptive next of kin of the incompetent. She is a second cousin, who only saw the incompetent three times during her entire life, once in 1878, once in 1879, and once in 1880 — almost a half century ago — and all of these occasions being before the date of the incompetent's marriage to Mr. Flagler in the year 1883, and it is undenied that since that date the petitioner has never seen or heard from the incompetent, or had any relations with her. It is also undenied that the petitioner on no occasion received any gifts, presents, remembrances, New Year's cards, or the like, from the incompetent, nor was she invited to the wedding ceremony in 1883.

I shall first consider the applicant's degree of relationship to Mrs. Flagler. As has been said, she is not one of the presumptive next of kin. She is a second cousin. Her relationship with Mrs. Flagler is traced through her maternal grandmother, Fannie Leek, who was a sister of Margaret Leek, the mother of Mrs. Flagler. In

my opinion, the evidence was sufficient to establish the ultimate fact that petitioner is a second cousin of Mrs. Flagler, in the absence of any evidence to the contrary, and, indeed, I understand that the committee of the property and the heirs and next of kin concede the petitioner's relationship.

I shall next consider the means and the necessities of the petitioner. Let me state at the outset that she impressed me as a God-fearing, honest and decent woman, of good character and undoubted veracity. Her testimony impressed me as truthful, and it is to the credit of herself and her learned and conscientious counsel that the testimony was in no wise stretched or exaggerated, easy as it might have been to do so. Therefore, in considering this aspect of the question, I shall accept her testimony, as I told counsel upon the oral argument before me, at its full face value. It appears that the petitioner is a widow sixty-one years of age last July twenty-third. Her husband, who was a carpenter by trade, died in June, 1924. She has no occupation, doubtless due to the fact that until her marriage, at the age of twenty-three years, she helped her crippled mother with the household work, and subsequent to her marriage was occupied with the duties of her home and household. She became the mother of two daughters, both of whom are now living. Her state of health was good until the winter last past, when she underwent treatment for high blood pressure. Dr. Hugh M. Cox, who examined her on April 25, 1927, at the request of the special guardian, reports that her principal troubles are gastro-intestinal and arterial changes. He remarks: " Most of the above conditions are amenable to treatment and are not as serious as they may sound."

He further states: " Hard work, long hours of work, or work requiring mental effort, will shorten her life."

It seems reasonably clear that the petitioner is in no position to earn her own living.

The petitioner is, however, not destitute, and it is very doubtful whether a case of present necessity is made out, at least at the present time. About three years ago petitioner purchased a lot of land in Lynbrook, L. I., at a cost of $1,650, and proceeded to build a house thereon at a cost of about $7,000. The house was not completed until after her husband's demise in June, 1924. His insurance money, amounting to $2,000, was largely spent in completing this house. The house and lot are subject to a mortgage in the sum of $3,500, bearing six per cent interest. The petitioner testified that her equity in this house and lot was worth about $4,000. The house was rented from October, 1924, until October, 1926, at the sum of $85 per month. Since that date it has been

vacant.  Petitioner refused an offer to rent it at $50 a month. The property has been on the market for sale at the price of $10,000, but petitioner has received no offer for it, although willing to take less.  No repairs or improvements to the house are necessary in the near future.  The petitioner also stated she had the sum of $426.34 in the bank, and outside of this sum and the house had no other property.

The two daughters of the petitioner are both married and apparently in comfortable circumstances, and both of them have stated that they are willing to render assistance to the petitioner, if and when she is in need.  One of these daughters, Mrs. Henry Newell, is married to a paying teller in the Jamaica Savings Bank, who receives a salary of $300 per month.  The Newells have no children.  They own and reside in a six-room residence at Lynbrook.  They own and operate a Buick automobile, model of 1925 or 1926.  The Newells have stated that they would be willing to furnish the petitioner with room and board, if her necessity so required, but in that case would expect the other daughter to help out with clothing and other necessaries.  The other daughter, Mrs. Richard R. Powell, is married to a salesman, who makes $4,000 a year.  The Powells have a child eight years old.  They own and live in a six-room house at Rockville Center.  The Powells have also stated that they would be willing to permit the petitioner to occupy a room in their home and furnish her with board, but in that case would expect the other daughter, Mrs. Newell, to assist with expenses of clothing, doctor's bills, and other necessaries.

As a matter of fact, since the date of her husband's demise, the petitioner has lived first with one daughter, then with the other, and voluntarily paid board at the rate of five dollars a week, until October, 1926, when the monthly income of rental from her Lynbrook house terminated.  She fixed the amount of five dollars per week herself.

It thus appears from uncontradicted proof that the petitioner has her choice of a comfortable home with either of her daughters, and tangible assets in an amount somewhere between $4,000 and $5,000, and that she is not confronted either with destitution or grave distress.  It further appears that the petitioner has a wealthy brother, Mr. William Butler.  He is president of the Beach Haven National Bank, in Beach Haven, N. J.  He has a summer home at Beach Haven; in the winter time, he resides at Merchantville, N. J.  Until January first of the present year he was a member of the board of freeholders of Ocean county, N. J., receiving a salary of $4,000 per annum.  He is concededly worth at least $50,000.

His wife lives with him. He has a married son and married daughter, and contributes to the expense of the married daughter's household, as her husband is confined in an asylum. The petitioner frankly admitted that she had no reason to believe that her brother would fail to help her, if she actually needed assistance and requested him to do so. She did not consult her brother before filing her petition herein.

The petition apparently was filed because petitioner read in the public press of the allowances granted to other relatives, and then wondered if she also could not obtain an income from the Flagler estate, and, after talking over the matter with one of her daughters, Mrs. Newell, commenced the present proceeding.

The foregoing testimony, which shows petitioner to possess at least $4,000 to $5,000, to have a brother in good circumstances who would be willing to help her in the event of necessity, and to possess devoted daughters in comparatively good circumstances, who are ready and willing to support her in their homes, must not and cannot be overlooked in an impartial consideration of this matter. When one eliminates considerations of sympathy and charity, toward which we are all inclined, it seems quite impossible to hold that a case of actual present necessity has been made out. The daughters and the brother — not the estate of the wealthy incompetent, a second cousin — should bear the burden, quite apart from the fact that the petitioner possesses an equity in real estate worth approximately $4,000.

In no case, however, would the applicant's relationship of second cousin to Mrs. Flagler and her alleged financial distress be of themselves sufficient to warrant this honorable court in making an allowance to her out of the estate of the incompetent. It is not enough to show that petitioner is a second cousin; it is not enough to show that petitioner is a worthy and respectable woman; it is not enough to show that she is frank and upright; it is not enough to show that she is far from wealthy; it is not enough to show that her house has been unrented for several months; it is not enough to show that an addition to her income would be indeed helpful. The fundamental point in this matter, and the crux of the entire case, is that convincing proof must exist to the effect that the incompetent person, Mrs. Flagler, would in all reasonable probability make a yearly allowance to the petitioner, Mrs. Rockhill, were Mrs. Flagler now sane and in possession of all her faculties and property.

While the stenographic minutes and the briefs of learned counsel are very voluminous, the ultimate question presented for determination can be stated in a very brief compass, as I stated at the

hearings, namely, by reason of the relations between the petitioner, Mrs. Rockhill, and the incompetent, Mrs. Flagler, is it reasonably probable and likely that if Mrs. Flagler were now *compos mentis* she would make such an allowance as is herein requested by Mrs. Rockhill?

The degree of proof required to support the granting of such an application for an allowance must be satisfactory and convincing. Speculation will not supply the evidence, nor will far-fetched inference or conjecture remedy the absence of substantial proof. The extent of proof which is necessary has been considered in a number of the authorities.

As long ago as the year 1844, Chancellor WALWORTH stated that he had no doubt of the power of the court, sitting in equity, to make such an allowance, but that the proof must make it " perfectly certain that the lunatic would make a provision for the suppo t of this young lady, if he was legally competent to do so." *(Matter of Willoughby*, 11 Paige, 257.) A few years later the same learned chancellor decided *Matter of Heeney* (2 Barb. Ch. 326), cited by the learned counsel for petitioner in his memorandum. In that case Chancellor WALWORTH elucidated the term " perfectly certain " by stating that the chancellor must be " satisfied, beyond all reasonable doubt, that the lunatic himself would have provided for the support of such person if he had been of sound mind, so as to be legally competent to do so." The same statement of the law was laid down by this court in *Matter of Kernochan* (84 Misc. 565), wherein Mr. Justice COHALAN stated that the facts and circumstances must make it appear " beyond a reasonable doubt that the incompetent, if sane, would assume such a burden."

In the case of *Matter of Lord* (227 N. Y. 145) the Court of Appeals laid down the rule that "Allowances of this character have been made, * * * upon the theory that the lunatic would, in all probability, have made such payments if he had been of sound mind."

It thus appears from controlling authorities that the applicant must establish her case with a reasonable degree of clearness. I do not subscribe to the doctrine, as laid down by Chancellor WALWORTH, that an applicant must prove his or her case " beyond all reasonable doubt." It seems to me that it is sufficient for an applicant to establish that it is reasonably certain that the incompetent " in all probability," to use the language of the Court of Appeals, if sane, would do on her own behalf for the applicant that which it is sought to have the court undertake herein.

It must be borne in mind that courts are required to scrutinize with care the evidence upon an application of this character,

recognizing that such applications by distant relatives must not be unduly encouraged. (*Matter of Evans*, L. R. 21 Ch. Div. 297 [1882]; *Matter of Darling*, L. R. 39 Ch. Div. 208 [1888].) Indeed, in the last-cited case, Lord Justice BOWEN said (p. 212): " The court has always considered that its jurisdiction to make allowances to collaterals ought to be exercised with the utmost jealousy. The case of successors to property depends on a different principle."

Tested by this criteron, the evidence establishes that the petitioner has not introduced proof sufficient to satisfy the rule. This necessitates a review of the record, to ascertain whether the applicant has furnished sufficient proof to make it reasonably certain that the incompetent, if sane now, would contribute an annual allowance to the support of the petitioner. In this phase of the case the applicant's proof is altogether insufficient. Indeed, there is hardly more than a bare scintilla of proof, let alone the quantum of satisfactory and convincing evidence of probative force which the law requires.

It must be remembered that each of these applications is a separate and distinct proceeding. There are doubtless cases where the proof is so satisfactory that a court is amply warranted in making an allowance even to collaterals. Thus, in *Matter of Heeney* (*supra*) the chancellor made an allowance out of the property of an incompetent for the support of two young ladies whom he had adopted, and whose educational expenses he was bearing, on the ground that there was substantial evidence showing that the lunatic would have assisted them, were he still of sound mind. In the present case the record is almost an absolute blank as to what Mrs. Flager, if now sane, would do and perform in the way of supporting the applicant.

The petitioner was born sixty-one years ago. In the year 1878, when the petitioner was thirteen years of age, the incompetent, then Miss Ida Shourds, brought her mother, Mrs. Shourds, to the home of petitioner's mother and father, Mr. and Mrs. Gershom Shreve Butler, in Tuckerton, N. J. The incompetent would remain a day or two with the Butlers, leave her mother there with them, and return a week or so later to take her mother, Mrs. Shourds, home. At that time petitioner was about thirteen years of age, and Mrs. Flager, the incompetent, about twenty years older. Another such visit took place in the summer of 1879, and another in 1880. The petitioner's mother generally remained with the Butlers about two weeks. Not so, however, the incompetent, who, according to the petitioner, " would stay about two days. She would bring her mother there and stay about two days, and then she would go back again to New York, or wherever she lived." And who subsequently

Misc. 430]                    Supreme Court, October, 1927.

" would come and get her mother and take her mother home." The incompetent was very kind to her mother and acted lovingly toward her. During this visit the petitioner's father would hire a sailboat about once a week and take them sailing on Little Lake Harbor Bay, which ran up into the village of Tuckerton, N. J. The petitioner frankly stated that these brief visits, almost a half century ago, constituted the only personal contact of any sort or nature which she personally had with the incompetent person. Since the date of 1880 the record is a nullity. There is no proof that the petitioner ever received any letters, gifts, cards or remembrances of any kind from the incompetent, nor was petitioner invited to the incompetent's wedding to Mr. Flagler in 1883; nor was a wedding announcement sent; nor is there even any proof that the petitioner ever saw the incompetent person again, or heard from her again.

It is true that the petitioner produced a photograph cf Margaret Shourds, the mother of the incompetent; but this was obtained out of the family album in Tuckerton, N. J., and does not appear to have been given to the petitioner, who testified: " I got it out of Mother's family album;   *   *   *   my mother must have put it in; my mother put it in the album."

The referee asked the petitioner concerning this photograph, and was frankly told by the petitioner that it had not been given to her. " Q. Do I understand you to say, Mrs. Rockhill, that that photograph was given to you by Mrs. Flagler? A. No. Q. Whom was it given to — to your mother? A. To my mother. Q. To your mother? A. Yes."

It thus conclusively appears that this photograph was given by Mrs. Flager's mother to Mrs. Rockhill's mother, and that the petitioner had absolutely no connection therewith in any manner.

It is also true that the petitioner produced a photograph of Mrs. Ida Flagler, the incompetent person; but here again the petitioner admitted that the photograph was not sent to her, but was sent to her mother. It came to her mother by mail, apparently without a note. The petitioner's mother placed this photograph also in the family album, where it remaned until the mother's death, when petitioner took it, together with the rest of the album. In the petitioner's brief it is stated that the photograph of Mrs. Flagler " was received by Mrs. Rockhill (petitioner) and her mother." This is inadvertently misleading. The record shows that the photograph of Mrs. Flagler was sent to the mother. " Q. How did you get that photograph, Exhibit 7, Mrs. Rockhill? A. It came to my mother by mail. Q. Well, with a note, or anything else, if it did? A. I don't know about the note, but I know the photograph came

by mail. * * * Q. And what was done with the photograph? A. Mother put it in the album. Q. Well, has it been in the album ever since? A. Until Mother's death. Q. And did you take it then? A. I took it."

And the referee asked the petitioner along the same lines, and elicited the same responses. At one of the later hearings, petitioner's counsel asked the petitioner to state in full all of her personal relations with Mrs. Flagler, the incompetent, which elicited the following response from the petitioner: " A. All I can state is Mrs. Flagler, or Ida Shourds, brought her mother to our house, and would stay two or three days, and then go back somewhere. I don't know whether she went to New York, Philadelphia, or where, and then she would come and take her mother back home again. That is my personal relations with Mrs. Flagler."

Attention is particularly directed to this quotation, because therein the petitioner states, with commendable fiankness, her entire personal relationship in connection with Mrs. Flagler, from which she seeks to persuade the court that it is reasonably certain that Mrs. Flagler, if sane now, would contribute an annual allowance to her support. The following testimony is also illuminating: " Q. Do you remember when Mrs. Flagler was married? (The year was 1883.) A. She was Ida Shourds, as far as I knew then. Q. Were you at the wedding? A. No; I was not at the wedding. Q. Did you receive an invitation for the wedding? A. No. Q. Did you ever see Mrs. Flagler at her home, after her marriage to Mr. Flagler? A. No. Q. Did Mrs. Flagler ever call at your home after her wedding to Mr. Flagler? A. No. Q. Have you any letter in your possession, written by Mrs. Flagler to yourself, within 10 years before she became committed? A. No; I haven't; no."

At this point petitioner's counsel stated that there was no further " personal touch " between petitioner and the incompetent, and that there was nothing other than the summer visits in 1878, 1879 and 1880, hereinbefore referred to. The referee thereupon questioned the petitioner in an endeavor to ascertain whether there were no further relations between herself and Mrs. Flagler, and on this point the record reads as follows: " By the Referee: Q. Mrs. Rockhill, all of those visits that you told about a week ago, when you were here, that were made by Mrs. Flagler's mother to your mother, were made back in the '70's, were they not? A. '78, the first one. Q. But none of them was made after the marriage of Mrs. Flagler? A. No. Q. You are sure about that? A. Yes. Q. And I would be right in saying, then, that most of them were probably around 1875, 1878, 1880? A. The first was in 1878. Q. All right; that is your testimony the other day. A. The last one was in 1880.

There were three successive summers. Q. When did they stop? A. In 1880; she was there the last time in 1880. Q. And you say you did not personally visit Mrs. Flagler? A. No; I never did. Q. Were you ever in your life a guest of Mrs. Flagler, either before or after her marriage, in her own home? A. No. Q. Did Mrs. Flagler send you Christmas presents after she was married? A. No. Q. Did she send you New Year's cards after she was married? A. No. Q. Did she send you any remembrance or trifle at Easter, after she was married? A. No; not that I know of."

At the close of the foregoing testimony petitioner's counsel stated: " Or that personal touch, we have given you absolutely everything we can give you on that."

And he also added, in answer to a question whether there was any further proof along this line: " On the personal relations; no. The witness has stated very honestly just what it is, and we cannot stretch it."

It does not appear from the record that, at the time of the summer visits in 1878, 1879 and 1880, the incompetent took any notice of the petitioner. There is no proof one way or the other on that subject. After the date of 1880 there is an entire absence of any proof showing any connection with, much less any generous impulse toward, the petitioner. There is no evidence that the incompetent person made any gift or donation to the petitioner, or, for that matter, even to petitioner's mother, or ever communicated with the petitioner, or ever mentioned the petitioner's name, and as a matter of fact there is no evidence that Mrs. Flagler, after the year 1880, was even conscious of the existence and continued life of the petitioner.

All intercourse, accordingly, of any nature, between the petitioner and Mrs. Flagler is limited to the brief occasions during the summers of 1878 to 1880, inclusive, almost a half century ago, referred to above, and the nature and character of this intercourse, and the circumstances surrounding it, in my opinion, do not furnish sufficient or satisfactory proof to make it reasonably certain or to make it reasonably probable that Mrs. Flagler, if she was sane at the present time, would contribute an annual allowance to petitioner's support. Indeed, it is very doubtful to my mind that the petitioner would even request the incompetent to assist her at the present time, were the incompetent in her right mind, so fragmentary, elusive, far-fetched and remote had been all their prior intercourse.

It cannot be denied that Mrs. Flagler always was eager to give assistance to her close relatives, e. g., her mother, brothers, sisters and nephews; that she was very fond of them, and upon intimate terms with them, is indisputable. The situation of such relatives

presents an entirely different picture from that which confronts us in the case of this petitioner.

There is some evidence in the record of financial assistance claimed to have been given by the incompetent to the Cassidys, Middletons and others, who were not her close relatives.   The referee opened the door wide to the receipt of this evidence, over-ruling the objections of the counsel for the committee of the property and of the counsel for the heirs and next of kin, on the ground that most of this evidence was hearsay and inadmissible.   Giving to this evidence its fullest effect, it in no respect tends to connect the peti-tioner with the incompetent.   Mrs. Williams frankly testified that she had never seen the petitioner and the incompetent together, and had never heard of or seen any communication from one to the other. Mr. Middleton, who testified to the receipt of boxes containing used clothing and of checks from Mrs. Flagler, admitted that, on the only occasion when he made any request to her for financial assist-ance, she never even answered his letter.   Mr. Middleton's testi-mony in this regard is as follows:  " Q. Did you ever carry on a correspondence with Ida Flagler, writing letters to her and receiving replies from her?   A. I only wrote to her once and never got an answer.   Q. On that occasion, when you wrote to her, you asked her to loan you some money?   A. I wanted to enter into a business deal with her.   Q. Didn't you ask her to lend you some money? A. To advance the money to buy a home, and she hold the mortgage. Q. Do you distinguish that from lending money?   A. In a sense, yes; when she is getting something in return, getting security in return.   Q. You asked her to lend you on security?   A. On security; yes.   Q. And you got no answer from her?   A. I never got an answer.   Q. And in what year was that?   A. Some time — I have a memorandum here.   Q. Do you wish to consult a memo-randum?   A. I do, yes; that was somewheres between 1883 and 1886.   Q. Is that as near as you can give it?   A. Yes."

Even if it be assumed that the record shows that Mrs. Flagler was charitably inclined and frequently helped some of her relatives, there is an entire absence of proof to make it reasonably certain, or even probable, that if Mrs. Flagler were now in her right senses she would assist the petitioner in the manner requested.   There is nothing in all the proof tending to show that Mrs. Flagler would assist the petitioner, whom she had not seen or heard from in the forty-seven years which elapsed between the date of the last summer visit to Tuckerton, in 1880, and the date of the filing of the present petition, in February, 1927.

In this connection, the large size and great number of the incom-petent's family connection on her mother's side of the house are

of much significance. From the examination of the petitioner and Mr. Middleton, it appears that the incompetent's mother had eight brothers and sisters, and it appears that not less than six first cousins and about twenty second Leek cousins were living during the period from 1877 till 1899, when Mrs. Flagler was adjudged incompetent. It appears from Mr. Middleton's testimony that the circumstances of many of this Leek family, with whom he kept in touch, were not good. Where a family is of such large size, these circumstances must be taken into account. Mrs. Williams herself may make an application for support from Mrs. Flagler's estate. She would not say definitely that she did not intend to apply. " Q. Is it possible that you will make an application in the future? A. I couldn't — I don't think so now. I couldn't tell. Q. But you would not definitely say now that you will not make an application? A. No; I would not say I will not; no."

It also developed in the hearings before me that a number of proceedings were then pending, including the *Smith Case (supra)*. The learned special guardian says in his memorandum " That the petitioner is the only one of her branch of the family who is likely to apply for assistance."

But this does not appear from the record, and is disputed by the counsel for the committee of the property and for the heirs and next of kin. It is quite true that each application must be considered separately, but the number of these applications that have been and are being made by comparatively distant relatives is a circumstance that must be taken into account in rendering a decision in accord with the reasonably probable course of conduct of Mrs. Flagler, if she were able to-day to manage her own affairs.

The learned counsel for the petitioner, in the last paragraph of his memorandum, states that " public policy opposes the hoarding of immense sums that cannot be honestly spent; " but it is equally true that the administration of the affairs of an incompetent's estate must be in accordance with her reasonably probable and certain desires and intentions, and there is no rule of public policy which authorizes or warrants the courts, as said by Lord Justice LINDLEY in *Matter of Evans* (L. R. 21 Ch. Div. 297, 301), " to give away a lunatic's property for the benefit of other people," except where it is reasonably clear that the lunatic would do so, and, as said by JESSEL, Master of the Rolls, in the same case (p. 299): " We [referring to courts of chancery] are not intrusted with the sign manual in order to enable us to apply the income of lunatics for the benefit of their poor relations "— and adding, at the next page, that there was insufficient evidence from which it could be inferred that the incompetent ever had any intention of doing anything for

the applicant, and " that the practice of giving away a lunatic's property ought to be narrowed rather than extended."

Little need be said as to the law on this subject, for it is reasonably clear. The rule is thus stated in Lord Halsbury's Laws of England (vol. 19, p. 438): " In deciding whether to make an allowance out of a lunatic's estate to relations for whom he is not bound to provide, the court is guided by a consideration of what the lunatic himself would probably have done if sane. Assuming the existence of an ample margin beyond the lunatic's personal requirements, the continuation of allowances, originated by him, to those to whom he stands *in loco parentis* is authorized almost as a matter of course, and in a proper case the court would itself originate such allowances. Further than this, allowances to other near relations, such as collaterals, may be made where *special claims* for consideration can be put forward. But it must always be borne in mind that it is not the duty of the court to deal benevolently or charitably with the patient's surplus income and that the tendency should be towards narrowing rather than augmenting voluntary allowances."

In Ruling Case Law (vol. 14, p. 579) the same rule is expounded. " A court of equity has power out of the surplus income of the estate of an insane person to provide for the support of persons whom the insane person is not under legal obligation to support, where it specifically appears that the insane person himself would have provided for such support had he been sane. The court in making such allowances acts for the insane person as it supposes he himself would have acted if he had been of sound mind, and the amount and proportion of allowances thus made rest entirely within the discretion of the court. The power of the court to make allowances out of the estate of an insane person for the purpose of carrying out the presumed wishes of such person extends to the case of donations for charitable and religious purposes, but it has been held that the committee or guardian will not be allowed personally to expend any part of the estate for general charity or objects of benevolence or piety for which the insane person himself had not been in the habit of contributing specifically and regularly while sane."

The first four cases, mainly relied upon by the petitioner, deserve brief comment.

1. *Matter of Heeney* (2 Barb. Ch. 326). In that case it appeared that the incompetent person, while sane, had actually assisted the applicants, and the petitions were granted by Chancellor WALWORTH on the theory that this showed that the lunatic would have assisted them were he still of sound mind. The applicants were two young

Misc. 430]                Supreme Court, October, 1927.

ladies whom the incompetent had adopted, whose board and clothing he furnished and for the expenses of whose education he had paid and was paying. The learned chancellor further stated, in this case cited by petitioner herself, that the chancellor must be satisfied " beyond all reasonable doubt " that the lunatic himself would have provided for the support of these persons if he had been of sound mind.

2. *Matter of Farmers' Loan & Trust Co.* (181 App. Div. 642; affd., 225 N. Y. 666). In that case also the opinion of the learned Appellate Division indicates that the court simply had continued the previous generosity of the incompetent person before he had become insane. It is manifest from the opinion that the incompetent had freely assisted the applicants financially and otherwise at various times, which is an entirely different situation from that presented herein. The case, moreover, merely decides that allowances made out of the estate of an incompetent, even though given to the heirs and next of kin, are not advancements, but gifts (pp. 644–646).

3. *Matter of Reichard (Bernard)* (N. Y. L. J. Feb. 14, 1919), per CROPSEY, J. In that case an allowance of $100 a month was made out of the estate of the incompetent to his sister. She was deaf, without any means whatever, and entirely incapable of self-support. It further appears, to quote the opinion, that " She has lived with and been supported by the incompetent for many years. The incompetent is shown to have been solicitous for her welfare and would have continued to support her if she had charge of her own affairs."

Under these circumstances, Mr. Justice CROPSEY's order was clearly proper; but petitioner herein is in a very different position and there is no proof at all in this record that the incompetent was " solicitous for her welfare " or would have undertaken " to support her if she had charge of her own affairs."

4. *Matter of Robert Law, an Incompetent.* That decision, cited by petitioner, was made by Mr. Justice BIJUR on February 20, 1919, directing the committee of the property of an incompetent to make an allowance out of his funds for benevolences to the St. James Methodist Episcopal Church, located at Madison avenue and One Hundred and Twenty-sixth street, New York city. It clearly appears from the papers in that proceeding that the incompetent had regularly and habitually made such contributions to the church before he became incompetent. No such situation is presented in the case at bar.

The learned special guardian, in his memorandum, cites one authority (*Matter of Flagler, In re Tash*, 126 Misc. 764). In

that case an application was made by a second cousin of Mrs. Flagler, a man seventy years of age, for support from her estate. It appears that Mrs. Flagler, to quote from the opinion, "had cause to be deeply indebted to [the petitioner's] grandparents, from whom *she* and her mother received assistance and sympathy at a time when they themselves were poor and needy." The court made an allowance, feeling that a special circumstance in favor of the petitioner arose from the fact that his grandfather, when prosperous, had helped to support Mrs. Flagler and Mrs. Flagler's parents. Assuming, without deciding, that this circumstance was of sufficient persuasive character to warrant the result reached, there is no evidence in the present record that Mrs. Rockhill's family, the Butlers, ever rendered any assistance, financial or otherwise, to Mrs. Flagler, or to the Shourds family, or that there was any obligation arising out of special circumstances, such as are alleged to have appeared in the *Tash* case.

Very recently, on June 1, 1927, Mr. Justice MITCHELL, sitting at Special Term, Part III, of the Supreme Court, New York county, disapproved an application made by a second cousin of Mrs. Flagler for support from her income (*Matter of Flagler [Smith]*, N. Y. L. J. June 1, 1927). The truth is, as above remarked, that each of these applications must be considered upon its own circumstances. There are doubtless cases where the petition should be granted, but only in those cases, and none other, where it appears with reasonable certitude that to grant the application would be in accord with the reasonably probable course of conduct of Mrs. Flagler, if she were now able to manage her own business affairs.

In the *Tash Case* (*supra*) two authorities are cited which require brief mention:

1. *Matter of Earl of Carysfort* (1 Craig & P. 76). There an allowance was made for the support of an aged personal servant of an incompetent. It appeared that the servant, one Wright, had lived with the earl as his personal servant from 1817 to 1840. The servant became so aged and infirm that he was no longer able to attend the earl. It appears from the report of the case that the next of kin of the earl specifically consented to the allowance and stated: "That they were satisfied that the allowance was one which the lunatic, if he should ever recover, would approve."

Upon these facts the lord chancellor made the order for a small allowance to the servant of the incompetent earl. In the case at bar the next of kin vigorously object to the granting of this application, and insist that there is no warrant for believing that Mrs. Flagler, if sane, would make any yearly allowance to Mrs. Rockhill.

2. *Matter of Strickland* (L. R. 6 Ch. App. 226). In that case an

allowance was made toward the building of a church out of the estate of an incompetent person. The petitioner was the heiress at law of the lunatic, his sole next of kin, and the committee of his person and property. The incompetent person owned considerable real estate in the parish. A church was urgently needed in the neighborhood. The court made an order granting the petition, which was obviously made, not as an allowance, but because it appeared that the erection of the church would increase the value of the real estate of the lunactic in the parish. JESSEL, Master of the Rolls, speaking of this *Strickland* case in the subsequent case of *Matter of Evans* (L. R. 21 Ch. Div. 297) stated (p. 298): "That is an expenditure in connection with the lunatic's property. The erection of a church increases the value of the house property in the neighborhood."

It thus is clear that neither of the authorities cited in the *Tash Case* (*supra*) nor the *Tash* decision (*supra*) itself, is any authority for the granting of an allowance to the petitioner in the present proceeding. The practice of making such allowances to collaterals, as said by Lord Chancellor COTTENHAM in *Matter of Blair* (1 Myl. & C. 300), is "one which could not be regarded with too much caution, and the principle involved in it ought to be narrowed rather than extended in its operation."

The same point of view was expressed by Mr. Justice COHALAN, writing for this court in *Matter of Kernochan* (84 Misc. 565), where the learned justice, overruling the referee, stated that "the recommendation of the referee appears to be a mere impulse of benevolence," and the thought and language seem directly in point in the present application, wherein the incompetent is under no duty to support the petitioner, and there is nothing to show close intercourse or relationship between the petitioner and the incompetent, and where there appears, therefore, no valid ground for giving away the incompetent's property, as against the objection of all her presumptive heirs at law and next of kin. The sympathy one must feel for the applicant does not constitute a basis for a juridical award.

It is not and cannot be claimed that the incompetent person is under any legal or equitable obligation to support the petitioner. It is not and cannot be claimed that the incompetent person, either while sane or insane, ever gave assistance to the petitioner or communicated with the petitioner, as distinguished from petitioner's mother. The only proof is that almost a half century ago the incompetent brought her mother to visit the petitioner's mother on three occasions, and remained there for one or two days on each occasion, subsequently returning to fetch her mother home. There

is no evidence of any letter writing, or for that matter of any communications of any kind or nature, between the petitioner and the incompetent from the summer of the year 1880, which marked the last of these visits, and the date of the present application, February 28, 1927. There are no " special circumstances " present. There is no proof of any intimacy between the petitioner and the incompetent at any time. There is a complete absence, indeed, of any " personal touch," as the petitioner's counsel phrased it. It does not appear that the petitioner ever visited the incompetent after her commitment in 1899, nor ever inquired after the welfare of the incompetent.

While one must feel sympathy for the petitioner and must respect her honesty, the granting of an application of this character must be controlled by recognized legal precedents and not by such considerations. Otherwise, the door might be opened to serious abuses.

For the foregoing reasons, I am of opinion that, while there are doubtless instances in which applications of this nature should be granted, no such set of facts and circumstances has been established by the petitioner in this case as would justify the making of the allowance asked for, in the light of well-settled precedent, and, therefore, I feel constrained to the conclusion that petitioner's application for the granting of an allowance should be denied.