In the Matter of the Judicial Settlement of the Account of THE FARMERS' LOAN AND TRUST COMPANY, as Temporary Administrator, etc., of EDWIN O. BRINCKERHOFF, and of the Account of THE FARMERS' LOAN AND TRUST COMPANY, as Administrator with the Will Annexed, etc., of EDWIN O. BRINCKERHOFF, Deceased.

EVELINA D. CLARK and Others, Appellants; JULIA M. DANIELS and Others, Respondents.

First Department, February 1, 1918.

**Decedent's estate — when allowances by Supreme Court from estate of lunatic to remote next of kin constitute gifts and not advancements — such allowances not chargeable against subsequent interests of recipients in the estate — authority of court of equity to make advancements from estate of lunatic for benefit of next of kin — authority of Surrogate's Court to modify orders of Supreme Court — doctrine of hotchpot or collatio bonorum.**

Allowances made to remote next of kin, brothers and sisters of the half blood and children of deceased sisters of the whole blood and sisters of the half blood, who were apparently not entitled to share in the estate, for their maintenance and support, from the estate of a testator who had been judicially declared incompetent under orders of the Supreme Court in which orders there was no provision charging the recipients with the amounts received in case they subsequently succeeded to an interest in the estate, are not advancements, but are gifts during the lifetime of the testator, and hence the court has no power to decree that they shall be surrendered or accounted for as a condition of taking an interest in the testator's estate which is fixed by the Decedent Estate Law.

The Supreme Court, in authorizing such allowances, acts as a court of equity, having custody and control of the estate of the incompetent; it acts for the incompetent in reference to his estate as it supposes the incompetent would have acted if he had been of sound mind.

A court of equity may legally allow payments out of a lunatic's surplus income to persons not entitled to any interest in his estate.

Orders of the Supreme Court, making gifts from the estate of a lunatic to remote next of kin for their maintenance and support, being valid, plain and unambiguous, the Surrogate's Court is without authority to write and incorporate into them a provision contradicting their terms and wholly unnecessary. This is so whether or not the doctrine of hotchpot or the similar doctrine of *collatio bonorum* obtains in this State.

The doctrine of hotchpot or the similar doctrine of *collatio bonorum* is based upon the fact that there must have been an intention of an intestate that there should be equality in inheritance among his children.

SCOTT and LAUGHLIN, JJ., dissented, with opinion.

APPEAL by Evelina D. Clark and others from parts of a decree of the Surrogate's Court of the county of New York, entered in the office ·of said Surrogate's Court on the 22d day of June, 1917, settling the accounts herein.

*Ezekiel Fixman* of counsel [*Clarence M. Lewis* with him on the brief; *Ezekiel Fixman*, attorney], for the appellants.

*Edward F. Moran* of counsel [*Charles C. Nave* with him on the brief; *Edward F. Moran*, attorney], for the respondents Julia M. Daniels and others.

*Cornelius A. Baldwin* of counsel [*Jacob H. Shaffer*, attorney], for the respondent The Five Points Mission, Old Bowery.

*George. N. Whittlesey* of counsel [*Stanley W. Dexter* and *Matthew C. Fleming* with him on the brief], for the respondents The Five Points House of Industry and American Female Guardian Society and Home for the Friendless.

*Francis Smyth* of counsel [*Cadwalader, Wickersham & Taft*, attorneys], for the respondent The New York Association for Improving the Condition of the Poor.

SHEARN, J.:

The testator, Edwin O. Brinckerhoff, by his will executed October 2, 1875, gave one-half of his estate to a friend, Edward R. Livermore, who predeceased the testator, and the remaining one-half to four charitable corporations. On February 23, 1877, the testator was judicially declared an incompetent person and a committee of his person and estate was duly appointed. Such committee, with a substitution duly made in 1891, continued to act as such until the death of the testator on December 7, 1915. The testator was unmarried and was survived by the following next of kin: The appellants Evelina D. Clark, a sister of the half blood; Frederick W. Cooper, a son of a deceased sister of the whole blood; Louise B. Armstrong, a daughter of a deceased sister

of the whole blood; Julia M. Harrison, a sister of the half blood; Daniel D. Brinckerhoff, a brother of the half blood; William N. Barlow, a son of a deceased daughter of a deceased sister of the whole blood; Robert B. Brown, Julia M. Daniels and Stuart H. Brown, children of a deceased sister of the half blood. During the lifetime of the testator and while he was confined in the Bloomingdale Insane Asylum, appel-lants, on notice to the committee, applied on petition to the Supreme Court, New York county, for and obtained orders directing the committee to pay out of the surplus income of the incompetent various amounts toward their maintenance and support. A typical petition and order appear in the record, being the application of the appellant Cooper dated December 5, 1913. The petition, after setting out the condi-tion of the estate, showed that the petitioner had been an invalid for many years, incapacitated for earning any money toward his support or the support of his family; that the petitioner was without any income or means with which to procure necessary medical attendance and appliances which his condition of health required; that the incompetent, before he became incompetent " was very kind and generous to your petitioner's mother and her children and manifested an interest in the comfort and well being of all of them and freely assisted them financially and otherwise at various times, and from time to time and whenever and to the extent desired by your petitioner's mother, and your petitioner verily believes that said incompetent person would now freely aid your petitioner and provide him and his family with all reasonable necessities for a comfortable home and maintenance if he could understand your petitioner's condition." The petition was sent to a referee to take testimony and the order making the allowance was based upon the referee's report. The orders contained no provision that the sums paid under them should be brought into account in the event that the beneficiaries thereunder should come into a share of the estate. Although the monthly payments made under said orders were small, the total during the entire period of years covered by them was considerable. These amounts were: Evelina D. Clark, $7,818.33; Louise B. Armstrong, $4,950; Frederick W. Cooper, $4,524.17; Daniel D. Brinckerhoff,

$1,100; Julia M. Harrison, $2,325, and Angelina Cooper, $2,450.

Objections to the probate of the will were filed by the next of kin of decedent. In order to avoid a contest, an agreement dated February 14, 1916, was entered into between the four charitable corporations, to whom was bequeathed one-half the estate, and all of the next of kin, whereby it was provided that the objections filed to the probate should be withdrawn; that all parties should unite in procuring the probate of the will; that the collective share of the charitable corporations in the estate should be one-fourth of the residuary estate and the remaining one-fourth bequeathed to the charitable corporations should be distributed to the heirs at law and next of kin of the testator in the same manner as if he had died intestate with reference to such one-fourth share. On the judicial settlement of the account of the temporary administrator of the estate, and administrator with the will annexed, the question was raised: What is the proper method of distribution, taking into consideration the sums paid from surplus income of the estate of the testator during his lifetime to the appellants pursuant to the orders of the Supreme Court? Certain next of kin, who had not received allowances during testator's lifetime, claimed that the legal plan of distribution was by charging these allowances against appellants and deducting them from their respective shares, thereby increasing the shares of the next of kin not having received any allowances under the doctrine of hotchpot. The learned surrogate upheld this plan of distribution in part upon the theory that under the civil law attached to the Surrogate's Court, the surrogate has equitable power to decree a *collatio bonorum*. (99 Misc. Rep. 420.) The appellants appealed from the portions of the decree which charge such allowances against them.

The learned surrogate has written an erudite and extremely interesting opinion, tracing the origin and development of the rules of hotchpot and *collatio bonorum*, and, reasoning therefrom, finds a basis for the decision appealed from. As a matter of fact, however, the distribution of and the right to take the property of a decedent is in this State regulated by statute.

It will aid a correct understanding of the controversy to

determine at the outset whether the allowances paid under the orders of the Supreme Court were advancements or whether their legal status was that of gifts made by the testator during his lifetime. " An advancement is an irrevocable gift *in præsenti* of money or property, real or personal, to a child by a parent to enable the donee to anticipate his inheritance to the extent of the gift." (14 Cyc. 162.) " An advancement is defined to be ' a gift by anticipation from a parent to a child, of the whole or a part of what it is supposed such child will inherit on the death of the parent.' (Bouv. L. Dict.) " (*Messman* v. *Egenberger*, 46 App. Div. 46, 51. See, also, *Bowron* v. *Kent*, 190 N. Y. 422, 431, 432.) It is, therefore, clear that allowances for maintenance and support, made to remote kin, brothers and sisters of the half blood and children of deceased sisters of the whole blood and sisters of the half blood, are not advancements in any legal sense. It may be noted here that even in the case of true advancements, *i. e.*, gifts from parent to child in anticipation of the child's inheritance, it has been held that " The right to charge advancements made by an intestate to his children against their distributive shares in his estate depends upon positive law, and the statute regulates the right and prescribes the circumstances and limitations under which the right exists." (*Beebe* v. *Estabrook*, 79 N. Y. 246, 249.) " It is not disputed that the right to charge against an heir at law a sum of money advanced by the ancestor did not exist at common law, but is entirely regulated by statute." (*Messman* v. *Egenberger, supra.*) The " positive law " referred to is sections 96 and 99 of the Decedent Estate Law (Consol. Laws, chap. 13; Laws of 1909, chap. 18). Furthermore, the provision as to advancement applies only in case of entire intestacy. (*Messman* v. *Egenberger, supra; Bowron* v. *Kent, supra.*)

That the legal status of these allowances was that of gifts made during the lifetime of the testator is equally clear. The Supreme Court, in authorizing such allowances, acts as a court of equity, having custody and control of the estate of the incompetent. (*Sporza* v. *German Savings Bank*, 192 N. Y. 8.) In so doing the court acts for the incompetent in reference to his estate as it supposes the incompetent would have acted if he had been of sound mind.

In *Matter of Heeney* (2 Barb. Ch. 326) Chancellor WAL-WORTH authorized the committee of the incompetent to permit two young ladies, not related in any way to the incompetent, to be supported as members of the incompetent's family, to have the education of one of them completed at the same expense at which the incompetent had educated her sister; to continue allowances to three aged ladies, who were in no way related to the incompetent. The chancellor said: " In the case of the late Dr. Willoughby, after a full examination of the subject, I came to the conclusion that the Court of Chancery had the power, out of the surplus income of the estate of a lunatic, to provide for the support of one who was not his next of kin, and whom the lunatic was under no legal obligation to support, where the chancellor was satisfied, beyond all reasonable doubt, that the lunatic himself would have provided for the support of such person if he had been of sound mind, so as to be legally competent to do so."

That the allowances in the *Heeney* case were gifts and not payments on account of applicants' interests in the incompetent's estate is, of course, obvious, for the beneficiaries were not related to the incompetent and not entitled to any interest in his estate. The chancellor ordered the payments to be made to them as gifts, just as the incompetent had made gifts to them during the period of his competency. This answers the suggestion of the respondents that for the court to make gifts out of the incompetent's estate to persons not entitled to any interest in the estate is illegal.

There are numerous other precedents upholding the legality of payments out of a lunatic's surplus income to persons not entitled to any interest in his estate.

In *Matter of Strickland* ([1871] L. R. 6 Ch. App. Cases, 226) committee of a lunatic was authorized to contribute £500 from the lunatic's surplus income toward the building of a school and church.

In *Matter of Earl of Carysfort* ([1840] Craig & P. 76) Lord COTTENHAM granted an allowance to an old personal servant, being satisfied that the allowance was one which the incompetent himself would have approved had he been capable of acting. The servant had no prospective interest

First Department, February, 1918.    [Vol. 181.

in the estate of the incompetent. Clearly the allowance was a gift which the court believed the incompetent would have made himself.

In *Ex parte Whitbread* ([1816] 2 Mer. 99) Lord Eldon, in discussing the reasons for granting allowances out of the estates of lunatics, said (pp. 102, 103): " But the Court does not do this because, if the Lunatic were to die tomorrow, they would be entitled · to the entire distribution of his estate * * * and if we get to the principle, we find that it is not because the parties are next of kin of the Lunatic, or, as · such, have any right to an allowance, but because the Court will not refuse to do, for the benefit of the Lunatic, that which it is probable the Lunatic himself would have done."

Further showing that the legal status of such allowances is that of a gift, Cotton, L. J., said, in *Matter of Whitaker* ([1889] 42 Ch. Div. 119, 126): " Undoubtedly the court has jurisdiction to do that, because we often (although not to so large an amount as this) give, out of the personal estate of a lunatic that which is mere bounty on his part when we see that it is in accordance with his views and his declarations before he became lunatic. That generally occurs in the case of charities where the lunatic has himself, while he was of sound mind, supported institutions of a charitable nature, and we continue that support, and perform for him when he becomes a lunatic that which we can see was his own intention while of sound mind."

In Shelford on Lunatics (pp. 101, 159) the author says: " There are instances in which the court has, in its allowances to the relations of the lunatic, gone to a further distance than grandchildren — to brothers and to other collateral kindred; but the principle is not because the parties are next of kin of the lunatic, or as such have any right to the allowance, but because the court will not refuse to do for the benefit of the lunatic that which it is probable the lunatic himself would have done."

Now, then, if these allowances were gifts, as it must be apparent they were, they belonged to the donees when paid. It was, of course, entirely competent for the Supreme Court, in equity, to impose as terms for granting the petitions for equitable relief a stipulation that the petitioners would agree

to be chargeable with the amount of the allowances in the event that they subsequently by any chance succeeded to an interest in the estate; but in none of these orders was any such provision made. In the absence of any such provision, these allowances when so paid were the absolute property of the donees. When the testator died, the interests of the appellants, who were among the donees, in the decedent's estate were absolutely fixed by the statute. There is nothing in the statute suggesting that there should be subtracted from their vested interests in the estate sums given to them by the testator in his lifetime. How, then, can any court enter upon this field, which is comprehensively and precisely governed by statute, and decree that, because it appears equitable so to do, the vested interests of the appellants in the estate shall be diminished by the amounts which, in law, were given to them absolutely during the life of the testator? It cannot be done except by overriding legislative enactments by judicial legislation. When an estate is being distributed according to law, it is no justification for ordering a different distribution because it would be more equitable. If a man died intestate, leaving an estate of $10,000, and had made one of two surviving nephews a gift of $5,000 a week before his death, it would seem more equitable, on the basis that equality is equity, to charge the donee with his $5,000 on the distribution of the estate between the two. No one would suggest, however, that this could be done. Even in the case of gifts to children, where the principle that equality is equity has its real application, it has been held that the gifts are not to be held advancements on account of their interest in the parent's estate unless it appears to have been the intention of the parent that the gifts should be so considered. (*Matter of Morgan*, 104 N. Y. 74.) These allowances for support and maintenance, being in law gifts during the lifetime of the testator, and being made absolutely and without any conditions attached, there is in my judgment no power in any court to decree that they shall be surrendered or accounted for as a condition of taking an interest in the decedent's estate, which interest is fixed by law.

With reference to the rules of hotchpot and *collatio bonorum*, it may be observed that, strictly speaking, there was at common

law only one case where the rule of hotchpot was applied; that is, where daughters inherited as coparceners, one daughter having previously received property on her marriage. The same principle is noticed by Blackstone (Bk. II, 190) as applied in the customs of York and London to personal property, and these customs seem to have been incorporated into the English Statute of Distributions which was adopted by this State and is, in its present form, section 99 of the Decedent Estate Law, above referred to.

In equity hotchpot was the name given to the rule " whereby a person, interested along with others in a common fund, and having already received something in the same interest, is required to surrender what has been so acquired into the common fund, on pain of being excluded from the distribution." (Ency. Britannica, vol. 13, p. 803.)

The term is also used in a more circumscribed sense in connection with the Statute of Distributions, as appears in a definition of the word by Bouvier: " The bringing together all the personal estate of the deceased, with the advancements he has made to his children, in order that the same may be divided agreeably to the provisions of the statute for the distribution of intestates' estates." (Bouv. Law Dict. [Rawle's Rev.] 963.)

" The same principle is to be found in the *collatio bonorum* of the Roman law; emancipated children, in order to share the inheritance of their father with the children unemancipated, were required to bring their property into the common fund." (Ency. Britannica, vol. 13, p. 803.)

The surrogate in arguing that the doctrine of *collatio bonorum* is part of the system of English equity jurisprudence which is to be applied in this State in the absence of statute, says: " If the record of the judgments of the clerical chancellors were extant, I am persuaded that it would disclose that the civil law of *collatio bonorum* was not only argumentatively authoritative in our equity, but absolutely binding and a source of law." And again: " That courts of equity would, in an administrative suit, quite independently of ' hotchpot ' or the Statute of Distributions, compel the recipients of advances to bring back the sums advanced into the account on a general distribution there can be no doubt.

*Edwards* v. *Freeman*, 2 P. Wms. 435; *Phiney* v. *Phiney* (1708) 2 Vern. 638. In a note to this last case an editor of a century ago states: ' It is apprehended a gift of personalty in the lifetime of the intestate to his heir at law must be brought by the heir in all similar cases *into* ' *hotchpot*.' This is a mere statement of a general principle in equity. He obviously means by ' hotchpot' *collatio bonorum*." (99 Misc. Rep. 429.)

It is apparent that the former quotation is merely an expression of opinion and the latter carries its own refutation, because the cases all use the term " hotchpot " and make no mention of *collatio bonorum*, and the editor above referred to undoubtedly meant what he said. Both the cases cited by the learned surrogate state the proposition that the theory of hotchpot will be applied in relation to the Statute of Distributions where advancement was by way of marriage settlement to a child. There is no distinct equity principle involved in these cases, but merely the doctrine of hotchpot as above defined in the interpretation of the Statute of Distributions.

But if it be assumed that the doctrine of *collatio bonorum* applies in this State, being inherited from the civil law through English chancery, this would not support the surrogate's conclusion, since the doctrine of *collatio bonorum* is applicable only to cases where advances were made to children (Domats Civil Law by Strahan [Cushing's ed.], vol. 2, p. 249) and probably only in cases of intestacy.

However, there is little doubt that the *effect* of hotchpot and *collatio bonorum* is the same, and at the present time the use of the terms seems to be interchangeable, the basic theory of each being equality among children of the intestate. The Legislature has provided cases where the principle of hotchpot is applicable in the distribution of decedents' property in section 99 of the Decedent Estate Law, and if it had intended the principle to apply to other cases, there would be a statute expressing such intention.

The learned surrogate, however, preferred not to rest his decision on the right of the Surrogate's Court, in the absence of statute, to decree a *collatio bonorum*, but advanced another ingenious ground. Conceding that the Surrogate's Court could not invalidate the orders of the Supreme Court awarding

sums out of the estate of the incompetent, but finding therein no direction that the sums allowed should be brought in the reckoning on the final distribution of the estate, the surrogate declares that such orders fail to conform to the practice of the Court of Chancery, both of England and of this State, by omitting such a provision, and then proceeds to "interpret" the orders as impliedly containing such a provision. The surrogate says of the Supreme Court justices who made the several orders: "They doubtless intended that the advances to those entitled to share in the succession should be on the usual terms; that is to say, that the adult beneficiaries advanced should bring their advances into the final reckoning of the lunatic's estate." Of course the Surrogate's Court has no power to revise, alter or change the plain terms of an order of the Supreme Court, either directly or through the indirect process of interpretation. Neither does it appear quite correct to say that the invariable practice was to insert such a provision, for hereinabove are cited numerous cases where such a direction was not made. Moreover, it would seem from the theory on which such orders are made, *i. e.*, gifts, that there is no necessity for incorporating therein any direction of hotchpot or *collatio bonorum*. The surrogate cites *Matter of Willoughby* (11 Paige, 259) where the chancellor said: "But my present recollection is, that in all those cases, I required the *adult children*, who were competent to support themselves, to give a stipulation that the amounts advanced to them respectively should be brought into hotchpot, upon the death of the lunatic; if any part of his personal estate should come to them under the Statute of Distributions."

This quotation is of course fairly susceptible of being interpreted as meaning that it is only in the case of adult children who may later share in the decedent's estate through the Statute of Distributions that the doctrine of hotchpot is applied. This is most probable, as the doctrine of hotchpot or the similar doctrine of *collatio bonorum* is based upon the fact that there must have been the intention of the intestate that there should be equality in inheritance among his children. In the case of advancements, therefore, one would expect to find such a provision, but not in such orders as these which are made upon the basis of being gifts.

Although the power should be sparingly and cautiously exercised, the Supreme Court unquestionably had the power to make these gifts, acting for the incompetent and as he would have done. There was nothing before the court to show that the petitioners would be likely to share in his estate. In fact, if the will had been produced, it would have clearly appeared that they were not to share in the estate. There was no basis for treating the allowances as advancements, and, if gifts, there was of course no occasion to insert in the orders a provision that they should be returned. The orders being valid, plain and unambiguous, the Surrogate's Court was without authority to write and interpret into them a provision contradicting their terms and wholly unnecessary, whether or not the doctrine of *collatio bonorum* obtains in the State of New York.

It follows that the parts of the decree appealed from should be reversed, with costs, and the decree modified by providing that the payments made to the appellants should not be treated as advancements or charged against appellants.

CLARKE, P. J., and PAGE, J., concurred; SCOTT and LAUGHLIN, JJ., dissented.

SCOTT, J. (dissenting):

I am unable to concur in the opinion adopted by the majority of the court. So far as regards the history of the practice which has grown up of making payments out of the estate of incompetents to persons or objects to which it is assumed that he would himself have made payments, if competent, there is nothing to be added to the learned opinion of Mr. Surrogate FOWLER (99 Misc. Rep. 420), and I should be content to rest my dissent upon that opinion but for the fact that it appears to be assumed by a majority of my associates that the surrogate, by the order appealed from, has in some way undertaken to review and modify the orders of the Supreme Court which permitted the payments to be made to the incompetent's next of kin. I do not understand that the surrogate's order is open to any such imputation. The orders of the Supreme Court did not undertake to pass in any way upon the question as to whether or not such payments should be taken

into account when the time came for a distribution of the estate. That question was left open, to be considered and decided when the proper time arrived, to wit, when the estate was to be distributed. That time has now arrived and it is necessary to determine how such a distribution is to be made. To so determine we must have regard to the principles of equity, since the whole subject is an invention of equity. There is no warrant in law for giving away any part of the estate of an incompetent, and the justification for so doing can be found only in the authority vested in equity to deal with the estates of such persons, and such payments always rest in the sound discretion of the chancellor, or of the court exercising equitable jurisdiction. It certainly is not equitable to so distribute the estate that those of the next of kin who by diligent importunity have induced the court to permit them to share in the estate before the death of the incompetent should profit to the extent of such advances over other next of kin of an equal degree of relationship to the incompetent and presumptively entitled to share equally in his estate. Exact equality, which is equity, can only be attained by taking into account in the final distribution of the estate the amounts which have been advanced to some of the next of kin before their absolute right to share in the estate accrues. Such payments should in my opinion be treated as advancements, although technically that name is commonly applied to advance payments to children. To say that such payments are in the nature of gifts does not, as I think, determine the question whether or not they should be taken into account when the estate is distributed. In a sense of course they are gifts, in that no consideration is given for them, and the recipient becomes absolutely entitled to take and use them, but none the less they are advances out of the estate, and are justified, so far as concerns next of kin at least, by the circumstances that in the natural course of events the recipient will become entitled to share in the estate. These views are, I think, supported by the fact that such allowances are usually, if not always made, as they were in this case, without notice to the next of kin to whom no advances are made, and who have no opportunity, until the question arises as to the dis-

tribution of the estate, to be heard as to the propriety of the preferential payments by which according to the views of the majority, their distributive shares are to be reduced.

LAUGHLIN, J., concurred.

Decree so far as appealed from reversed and decree modified as stated in opinion.  Order to be settled on notice.