## UNITED STATES v. MOTT.

Circuit Court of Appeals, Tenth Circuit. January 27, 1930.

No. 136.

Charles B. Selby, Sp. Asst. to Atty. Gen. (Seth W. Richardson, Asst. Atty. Gen., John M. Goldesberry, U. S. Atty., of Tulsa, Okl., and Louis N. Stivers, Asst. U. S. Atty., of Tulsa, Okl., on the brief), for the United States.

Edwin S. Booth, of Washington, D. C. (Chas. B. Rogers, of Tulsa, Okl., on the brief), for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge. This suit was brought by the United States in behalf of one Jackson Barnett, a full-blood Creek Indian, to recover of appellee Mott $15,000 face value U. S. Government Bonds, or their proceeds or value if they have been converted. It is alleged that the bonds are the property of Barnett and that they came into the possession of Mott in this way: Barnett was allotted 160 acres out of Creek Tribal lands, which proved to be valuable in oil deposits. With the approval of the Secretary of the Interior the land was leased and large sums came into his possession from royalties paid for the oil produced, and these royalties, were invested in United States bonds, amounting in face value to more than one million dollars. The bonds were held by the Secretary of the Treasury. Early in 1923 Barnett and his wife went to Washington, and with assistance of counsel sought to induce the Secretary of the Interior to deliver to them $1,100,000 face value of these bonds, with the understanding that they would be used or disposed of as hereinafter stated. He finally complied with their request, got the bonds from the Treasury and $550,000 in face value were delivered to the Equitable Trust Company of New York, which was to hold them as trustee and from the income pay Barnett $20,000 yearly so long as he should live, the remainder of the income until Barnett's death to go to the American Baptist Home Mission Society of New York, and on the death of Barnett all of the income to be paid to that society. At the same time the additional $550,000 face value U. S. bonds belonging to Barnett were turned over to Barnett's wife, whom he had recently married and who is a white woman. Of the bonds so turned over to Barnett's wife the understanding was that she should deposit $200,000 thereof in the Riggs National Bank of Washington, D. C., to be held in trust, and of the yearly income $7,500 was to be paid to Barnett during his life, the remainder of the income during that time, if any, to be paid to his wife, and upon his death the whole income and various portions of the principal, were from time to time to be also paid to her or to her daughter until all thereof had been so paid. She complied with this part of the arrangement and deposited

the $200,000 in bonds with the bank. Of the remaining $350,000 face value of said bonds turned over to her she immediately delivered $150,000 thereof to Harold C. McGugin, who appears to have been the chief adviser in the whole affair, and McGugin delivered $15,000 face value of said bonds to the defendant Mott. These are the bonds sued for.

Plaintiff further charged that the Secretary of the Interior, McGugin, Mott and others who participated in the transaction knew that all of the bonds were the property of Barnett and had been purchased for him with royalties on oil taken from his restricted allotment; they also knew that Barnett was a mental incompetent without capacity to make or to initiate the disposition and distribution of said bonds and that the officers of the United States participating in the transaction were without authority of law to dispose of said bonds in the manner stated, and that the disposition made of them was contrary to the purpose, intent and effect of the law in such case; that Barnett at the time was of the age of about 70 years, illiterate, mentally incompetent and wholly incapable of managing his own affairs or of caring for his property, and unable to appreciate and understand the nature and extent thereof, and that the delivery and distribution of said bonds was based upon a purported request in writing bearing the thumb print of said Barnett, which by reason of his mental infirmity he was wholly unable to comprehend and understand.

The foregoing facts were alleged in a second amended complaint. The original complaint is not in the record. The first amended complaint contains in substance the allegations of fact that have been stated, and in addition thereto it charged fraudulent conduct and a conspiracy on the part of Barnett's wife, McGugin, Mott and others to get for themselves a large part of Barnett's property. The second amended complaint omitted the allegations of fraud and conspiracy. The court below held that the tendered pleading did not state any ground for relief and denied the request to file it. This appeal was then taken, the error assigned being the refusal of the court to permit the second amended complaint to be filed. The theory of the suit, disclosed in the tendered pleading, is that the Secretary of the Interior exceeded his power in delivering the bonds, that he was fully advised of the whole plan and purpose of McGugin et al., and the distribution of the bonds to be made after delivery, and that because thereof the bonds are still the property of Barnett.

The Act of May 27, 1908 (35 Stat. 312), treats of allotments to members of the Five Civilized Tribes, restrictions on disposition by the allottees and the power of the Secretary of the Interior in relation thereto. Section one of the Act provides, among other things, "and all allotted lands of enrolled full-bloods * * * shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-six, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe." Section 2, in part: "That leases of restricted lands for oil, gas or other mining purposes, * * * may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise." Section 5: "That any attempted alienation or incumbrance by deed, mortgage, contract to sell, power of attorney, or other instrument or method of incumbering real estate, made before or after the approval of this Act, which affects the title of the land allotted to allottees of the Five Civilized Tribes prior to removal of restrictions therefrom, and also any lease of such restricted land made in violation of law before or after the approval of this Act shall be absolutely null and void." These provisions of the Act established Barnett's legal incompetency to manage his own affairs, and so we need give no consideration to the allegations that he was in fact mentally incompetent. Congress, in the exercise of undoubted power, provided in this Act that the Government should control and preserve Barnett's property. This protecting care included not only his allotment but also the income therefrom. Sunderland v. United States, 266 U. S. 226, 45 S. Ct. 64, 69 L. Ed. 259; United States v. Brown (C. C. A.) 8 F.(2d) 564. The United States, through its Secretary, took the royalties for mineral produced from his allotment, as his guardian, and held them and the bonds purchased with them in trust for him. Assuming the Secretary had power to remove restrictions on Barnett's disposition of the bonds, as he had to remove restrictions on disposition of his allotment; still the Act further provided that disposal of the proceeds, in event re-

strictions were removed, should be for Barnett's benefit. The duty of the Secretary, then, did not cease with removing restrictions and thus permitting disposal, but he was also charged with the further duty and authority in the same transaction of seeing that disposal should be made for his benefit. Manifestly, it is the intention of the Act to safeguard at all times the property of full-bloods, whether allotments or proceeds therefrom, for their benefit. The bonds were Barnett's property and the Secretary, as Government agent, had the power and was charged with the duty of holding control over their disposition for the benefit of Barnett, and for no one else. He had no right to dispose of them as gifts or donations nor consent to such disposal. Of course, no one would argue that reasonable sums for those purposes might not be disbursed with the Secretary's consent, and likewise amounts from time to time for Barnett's proper maintenance. But that is not this case. The statute is an assurance of protection against spoliation. The Secretary's duty and power are not complied with by simply removing restrictions on alienation to a large part, probably here the far greater part, of the ward's estate; as part thereof it is further required of him that he agree to the terms of sale and the disposal of the proceeds. He is given no authority to turn over the property or its proceeds to the Indian, nor consent that others might take to themselves the whole or a large part of it. Nor do we know of any authority in him to surrender the trust in which these bonds were held by the Government and consent to their deposit with others as trustees on terms that took from Barnett all property right in the principal and denied to him their full interest yield. As to the $350,000 given to Mrs. Barnett, she could on delivery make disposition as she might wish, and she at once did so to the extent of almost half. In Barnett v. Equitable Trust Co. (D. C.) 21 F. (2d) 325, Judge Knox ordered that the $550,000 in bonds held by the trust company be returned to the Secretary of the Interior. It may be conceded that if under facts in a given case it should be debatable whether action of the Secretary was for the benefit of the allottee, his judgment and action ought to control; but we are unable to see any ground on which a claim may be made that the disposition of any of these bonds was for the benefit of Barnett, within the meaning and requirement of the statute. It seems clear to us that the statute is obligatory in that respect, and that the Secretary had no right to consent to the trans-

action. He had the power and was charged with the duty of preventing it. And so we conclude there was arbitrary and unauthorized action by the Secretary violative of the trust, with full knowledge on the part of all participants.

■ Where an executive officer, under his misconstruction of the law, has acted without or beyond the powers given him, the courts have jurisdiction to restore the status quo ante insofar as that may be done. Garfield v. Goldsby, 211 U. S. 249, 261, 262, 29 S. Ct. 62, 53 L. Ed. 168; Work v. Louisiana, 269 U. S. 250, 254, 46 S. Ct. 92, 70 L. Ed. 259; Santa Fe Pacific R. R. Co. v. Fall, 259 U. S. 197, 199, 42 S. Ct. 466, 66 L. Ed. 896; Payne v. Central Pacific Ry. Co., 255 U. S. 228, 238, 41 S. Ct. 314, 65 L. Ed. 598; Williamson v. United States, 207 U. S. 425, 462, 28 S. Ct. 163, 52 L. Ed. 278; Hemmer v. United States (C. C. A.) 204 F. 898, 905; Leecy v. United States (C. C. A.) 190 F. 289, 292.

The decree of dismissal is reversed with directions to reinstate the suit, permit appellant to file its tendered second amended complaint and give appellees reasonable time within which to file answer.