**AMERICAN NAT. BANK OF BRISTOW, OKL., v. AMERICAN BAPTIST HOME MISSION SOC.**

Nos. 133, 134.

Circuit Court of Appeals, Second Circuit.
Aug. 16, 1939.

Patterson, Eagle, Greenough & Day, of New York City (Carroll G. Walter of New York City, and Creekmore Wallace, of Oklahoma City, Okl., of counsel), for appellant.

Hughes, Richards, Hubbard & Ewing, of New York City (Charles E. Hughes, Jr., Leighton H. Surbeck and Richard W. Hogue, Jr., all of New York City, of counsel), for appellee.

Before AUGUSTUS N. HAND, CHASE and PATTERSON, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendant, American Baptist Home Mission Society, a New York corporation, owns and operates Bacone College and Murrow Indian Orphans' Home near Muskogee, Oklahoma. The Orphans' Home is a charitable institution for orphan Indian children and Bacone College is also primarily a school for Indian students, many of whom cannot pay for an education. A few white students attend, but the great majority of the student body is Indian and over one-half pays no tuition. Since 1918 the President of the College and Superintendent of the Orphans' Home has been Dr. Benjamin Weeks, an ordained Baptist minister, who solicited the transfers of $50,000 and $100,000 to the defendant in the years 1920 and 1923 made by Suma Burgess and her mother, Lucy Poloke, respectively.

In August 1919 Dr. Weeks spoke to meetings of the Muskogee-Wichita-Seminole Baptist Association about the needs of the school and the Orphans' Home, and a committee of Indians was appointed to visit the school and home and investigate their needs. Suma Burgess and her mother, Lucy Poloke, were present and there met Dr. Weeks for the first time. Suma had received considerable education and read, wrote and spoke English, but Lucy spoke only Creek although she understood English to a slight extent. Both Suma and Lucy were deeply interested in work of the Baptist Church and were active in various Baptist Church organizations. Lucy was a member of the Women's Missionary Society for many years and Suma was president of it for two years. Likewise Suma had been secretary, treasurer and vice-president of the Ladies Aid Society and had taught Sunday School. The next gathering of the As-

sociation in August of 1920 was attended by Suma, who presided at a meeting of the women, and also by Lucy. Dr. Weeks announced at the meeting that land had been donated on which to build new dormitories and that two fireproof buildings costing at least $50,000 each were necessary to accommodate the children of the Orphanage.

The next day, on the suggestion of a Mr. Harjoe, the donor of the land, Dr. Weeks visited Suma and her mother at their tent in the grounds nearby. Peter Ewing, a full-blood Indian preacher who had been chairman of the committee sent to investigate the needs of the Orphans' Home, went along as interpreter for Dr. Weeks. They did not find Suma in then, but on their return the next morning they informed Suma and her mother of the need of a building, and Suma stated that she would give $20,000 and her mother $30,000 provided the Department approved. Suma explained to her mother in the Creek language the amount needed and the latter replied: "that is a good thing."

Shortly thereafter, and pursuant to arrangement, Suma met Dr. Weeks in Muskogee at the office of Mr. Parker, the local Superintendent of the Five Civilized Tribes, with whom she discussed the proposed donations. The Superintendent testified that Suma told him that she had been interested in young peoples' work in the church and that she and her mother wanted to help them by making this donation. Mr. Parker testified that he was satisfied that Suma fully understood that she was making a gift and that it was her voluntary act. He favored the gift and advised Suma and Dr. Weeks, who was not in the room during the conference, that he was willing to consider the application but that it must be made in writing. He also testified that Lucy was present at the conference and conversed with Suma during the discussion.

Under date of August 25, 1920 Suma and her mother signed letters (the mother's signature being by thumb mark) addressed to the Superintendent in which they expressed a desire to make a donation to the Orphans' Home. These letters were on the stationery of an attorney named Paul Lamb, an Indian who had known Suma since her childhood. At the foot of her letter Suma stated, in her own handwriting, that she desired to give $20,000, and at the foot of her mother's letter similarly stated that her mother desired to give $30,000. These letters were produced from the files of the local Indian

office and Dr. Weeks had nothing to do with their preparation.

Superintendent Parker advised Dr. Weeks that a contract should be drawn covering the transaction and one was prepared by an attorney named Broaddus. Dr. Weeks testified that he took the contract to Suma's home and explained it to her on September 20, 1920, that Suma then signed the document and assisted Lucy to put her thumb mark on it. Peter Ewing also testified to going with Dr. Weeks to the home of Suma, and to translating and explaining the 1920 contract to both Suma and her mother. Applications were thereafter made by Suma and her mother for payment of the gifts of $20,000 and $30,000, respectively. Two unsigned checks for the proper amounts made out to Suma and to Lucy were delivered to Dr. Weeks, who secured their endorsements and returned the checks to Superintendent Parker. The checks were then signed by the disbursing officer and returned to Dr. Weeks.

The dormitory, known as the "Poloke-Bosen Hall," was constructed thereafter at a cost slightly in excess of the $50,000 donation. Suma was present at the ceremonies for the ground breaking, the laying of the corner stone and the dedication of the building. On each occasion speeches were made to the effect that the building had been made possible through the donations of Suma and her mother, and Suma appeared very pleased at the references to her. Both Suma and Lucy stated to friends on other occasions that they had made this gift for the construction of the dormitory and indicated that they were pleased with having done so. Suma spoke of this gift and a later one in 1923 as the best investment she had ever made.

Dr. Weeks and Suma met at the Association meeting the following August of 1921 but at that time no mention was made of any further contributions. In January 1922 Dr. Weeks and Peter Ewing saw Suma and Lucy at their home and requested another contribution. He took with him a draft of a contract, similar to ones used by the Baptist Home Mission Society for 65 years, and explained its terms to both women. Peter Ewing was present and acted as interpreter for Dr. Weeks. The suggested terms of the donation were that Suma and Lucy should make a gift of $100,000 for the benefit of Bacone College and the Orphans' Home; and that $5,000 per year should be paid to the donors during their lives, and afterwards all the income should go to the

Orphans' Home and the school. Suma and her mother indicated that they were not prepared at that time to give an answer. In August 1922 Dr. Weeks spoke to Suma at the annual Association meeting as to certain interest that had accumulated on the fund of $50,000 between the time of its receipt and the time of payment for construction of the dormitory, but he apparently did not bring up the subject of another contribution. Suma advised Dr. Weeks that the interest might be used for the benefit of the orphan children. Shortly thereafter Dr. Weeks asked Mr. McComb, a Creek preacher, and one of the founders of Bacone College, to solicit a contribution to the endowment from Suma and Lucy, and Mr. McComb reported back the results of his conversation with them. The subject was not raised again until Dr. Weeks met the two women unexpectedly during the summer of 1923. As he was turning to leave them, he expressed a desire that they make the contribution. Suma then got out of her car, saying she wished to speak with him, and stated during the ensuing conversation that she and her mother would make the gift if he would take Liberty bonds. She then fixed a date for meeting him at the office of the Superintendent, who at that time was Mr. S. E. Wallen. Dr. Weeks testified that according to his recollection Suma told him she would give $17,000 in bonds and her mother would give the total of $83,000, of which $53,000 would be in bonds.

After the above conversation Dr. Weeks had two contracts prepared by Broaddus and met Suma, as agreed, outside the office of Superintendent Wallen. While waiting there he read and explained to her the nature of the contracts. Dr. Weeks then introduced Suma to Mr. Wallen, left the contracts with them, and retired to the outer office. Thereafter Wallen accompanied Suma to the office of Ward, acting attorney for the Creek Nation, and there Suma, in the presence of Ward and Edward Merrick, another lawyer connected with the local agency, who acted as witnesses, executed the contract.

Edward Merrick testified that Superintendent Wallen asked him to be sure that Suma understood what she was signing and said that he believed that he had gone over the contract with her. He could not remember the details of the transaction but stated that his invariable habit had been never to witness the signature of an Indian to a contract unless he was satisfied that

the Indian knew exactly what was being signed.

Assistant Superintendent Hunt testified that he went over the contract with Suma and explained it to her prior to the time of execution. He was convinced that she understood it and wanted to make the donation.

Superintendent Wallen also went over the contracts with Suma and Lucy at some date not precisely fixed but prior to execution. He testified that he had explained the contracts thoroughly to Suma and had spoken about the donations to Lucy and that she too desired to give the money to Bacone College. He asked Suma to inquire of her mother whether she wanted to make the donation, and Suma reported that her mother did. Lucy explained to the Superintendent that she wanted to give some money to the institution because of her interest in the church.

Suma took her mother's contract home for her to sign and it was returned executed with the thumb mark of Lucy, witnessed by Suma and Ellen Bowles, a friend of Lucy's. Dr. Weeks testified that he was not present when Lucy executed the agreement and we think the trial court was right in believing his statement even though two other witnesses testified that he was present. One of these witnesses, on his own story, was mistaken and the weight of the evidence, in our opinion, justified the finding of the court.

After the execution of the two contracts of 1923 both Superintendent Wallen and the Commissioner of Indian Affairs recommended them to the Secretary and approval thereof was subsequently given by the Secretary of the Interior, through his Assistant Secretary. Each of the contracts provided that the Society would invest the money received in merchantable, interest-bearing securities, and maintain therewith a fund, named for the donor, which was to become the property of the Society upon the death of Lucy and Suma. The Society agreed to pay 5% per annum on each of the sums donated to the respective donors and then to the survivor during her life. Thereafter the income was to be applied to the use of Bacone College and the Orphans' Home. The cash and bonds were thereafter turned over to the Society which has lived up to every requirement of the contracts.

At the conclusion of the trial the court summarized the contentions made by the plaintiff as grounds for setting aside the transfers both of 1920 and 1923 as follows.: (1) mental incompetency of mother and daughter; (2) conspiracy between representatives of the Indian Service and representatives of the defendant; (3) overreaching of the two Indian women; (4) lack of authority of the Superintendent to approve the 1920 transaction; and (5) lack of authority of the Secretary of the Interior to approve the 1923 transaction.

The trial court found that both the mother and daughter were mentally competent and capable of understanding the transactions by which they made the gifts of 1920 and 1923. The daughter Suma took the stand and the trial court discovered nothing that "would place her below the normal intelligence of the average white women, of similar situation in life, in the conduct of her affairs." Various friends and business men who had known Suma and had dealings with her testified that she was intelligent and most of them rated her above the average full-blood Indian. Lucy was uneducated and did not speak English, but the trial court on all the evidence concluded that she was rather an unusually intelligent person and that her intelligence continued unimpaired during the times of both donations and until long after the 1923 transaction.

There was testimony that approximately six months prior to the 1920 arrangement Lucy had two strokes of apoplexy which impaired her speech thereafter and paralyzed one side, but several witnesses support the finding of the court that her intelligence was not impaired. J. T. Wilkinson, a law clerk with the Department of the Interior, several times during the period in question, spoke to Lucy, through Suma as interpreter. He gained the impression that Lucy while "an average full-blood Indian who could not understand the English language or read or write", "understood what I was saying and what I was talking about." Joseph Brunner, a full-blood Creek Indian, who knew Lucy well, testified that she was a "pretty smart woman" and that her mental condition was "all right" at the time of both donations, and Susie Ewing, who had known Lucy for 30 years, said that as late as 1925 Lucy "had a good memory". The affairs of both the mother and the daughter appear to have been managed more prudently and with more avoidance of extravagance than after Lucy had died and the daughter came into control of the entire estate and began to squander money under the influence of

her husband. We think that the trial court properly found that the donations cannot be set aside because of lack of mental capacity of the mother or the daughter.

There is an entire failure of proof of fraud or misrepresentation on the part of anyone connected with either the defendant or the Indian Service and there is no ground for believing that the agents of the Department of the Interior acted with any motives other than the best interests of the two Indian women. The appellant claims that there was overreaching either on the part of the Society or the agents of the Indian Service. In our opinion that contention must also fail. The proofs show that the transactions were fully explained not only by Dr. Weeks but also by the Department officials and there is a sufficient showing that both mother and daughter understood the nature of the transactions in each year and intended to make the gifts. The long period during which the negotiations for each gift were had and the subsequent expressions of approval of the donations by both mother and daughter are inconsistent with the contentions of the appellant. The evidence shows that at the time of the 1920 gift the mother had a large property in addition to the accrued royalties, and at the time of the 1923 donation she had $216,-438 in cash and $53,000 in bonds accumulated from oil royalties together with considerable land and an income of $500 per month. The estate of the daughter was smaller than her mother's. It does not appear what amount of cash she had in 1920 but she did have considerable other property. · In 1923 Suma had $50,280 in cash and $17,000 in bonds accumulated through the payment of oil royalties together with an income of $175 per month. In 1929, approximately four years after the death of the mother, and in spite of some poor investments and extravagances, Suma nevertheless had $142,000 in cash, considerable land,

a stock of hardware, and the $5,000 annual income from the Society. While the testimony of the witnesses contains contradictions, we think after a careful perusal that it bears the marks of a substantially truthful account of what occurred both by Dr. Weeks, the Baptist minister Ewing, and the Superintendents and agents of the Indian Service. It would be much more open to criticism if every detail of the testimony of the different witnesses had been consistent with every other. We should under any circumstances be reluctant to reverse an experienced and painstaking trial judge on questions of fact but especially so where, as here, the testimony in support of the donations seems truthful and substantially self-consistent. In view of the evidence we agree with the court below that the attempt of the plaintiff to show either overreaching or fraud fails. Accordingly, the question as to the validity of the transactions must turn upon whether the Superintendent and the Secretary had authority to approve the donations.

The Creek Tribe Indians was one of the so-called Five Civilized Tribes which, prior to the Act of March 3, 1893, c. 209, 27 Stat. 612, held its land tribally and not in severalty in what is now the State of Oklahoma. By § 15 of that Act provision was made for the allotment of lands in severalty and by § 16 for the extinguishment of tribal title to any lands then held by the tribe within the Territory. An essential part of the plan of individual allotment was the placing of restrictions upon the right of alienation. See Heckman v. United States, 224 U.S. 413, 436, 32 S.Ct. 424, 56 L.Ed. 820. The relevant statutory provisions relating to such restrictions found in the Act of May 27, 1908, c. 199, 35 Stat. 312, are quoted in the margin.[1]

It is settled that under the statute the Secretary of the Interior has power by regu-

---

[1] Sec. 1. " * * * That * * * all allotted lands, of enrolled full-bloods * * * shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance * * * except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe. * * * .

"Sec. 2. That all lands other than ·

homesteads * * * from which restrictions have not been removed may be leased by the allottee if an adult, or by guardian or curator under order of the proper probate court if a minor or incompetent, for a period not to exceed five years, without the privilege of renewal: Provided, That leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years may be made, with the approval of the

lations to impose restrictions upon the disposition of the proceeds of sale of allotted lands and of the royalties from oil and gas leases and is empowered even to restrict other lands purchased with the proceeds of a sale. Sunderland v. United States, 266 U.S. 226, 235, 45 S.Ct. 64, 69 L.Ed. 259; Parker v. Richard, 250 U.S. 235, 238, 39 S. Ct. 442, 63 L.Ed. 954. See Mott v. United States, 283 U.S. 747, 750, 751, 51 S.Ct. 642, 75 L.Ed. 1385; Starr v. Campbell, 208 U.S. 527, 533, 28 S.Ct. 365, 52 L.Ed. 602. Both the statutory provisions and the cases cited, however, make it clear that the restrictions placed upon the disposition of oil royalties are not imposed by the statute directly but by the regulations of the Secretary. As Mr. Justice Van Devanter said in Parker v. Richard, 250 U.S. 235, at page 238, 39 S.Ct. 442, at page 443, 63 L.Ed. 954: "One of the regulations prescribed by the Secretary deals with the payment to lessors, their guardians, heirs, etc., of moneys collected as royalties by his representatives and specially authorizes the latter * * * to withhold such payment in whole or in part for such time as may be in accord with the best interests of the lessor or his heirs. It is under this regulation that the royalties already collected are being retained."

■ All the payments involved in this case are conceded to have been made from the accrued royalties of oil leases of restricted lands. The validity of the payments made is thus dependent upon the regulations of the Secretary, which are set out in the margin.[2] The conclusion of the trial judge that Regulation 20 empowered the Superintendent to make payments "for the benefit of the various lessors" out of accrued royalties seems well founded. It is incredible that the Secretary of the Interior should have been required by his own regulations to authorize all the various payments for food, supplies and equipment needed by every Indian through personal orders of himself or an Assistant Secretary. Moreover, it is evident from the record that the practice of the Department was to have payments for such purposes as well as for donations by Indians which were substantial in amount (though perhaps not large) approved and made by the Superintendent. Moreover Section 25, as amended November 29, 1912, which was not referred to by the trial judge, specifically authorizes the Superintendent "in his discretion, where considered for the best interests of any adult * * * lessor * * for whose account royalties, rents or payments accruing under any lease have been

Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise.

\* \* \* \* \* \*

"Sec. 5. That any attempted alienation or incumbrance by deed, mortgage, contract to sell, power of attorney, or other instrument or method of incumbering real estate * * * which affects the title of the land allotted to allottees of the Five Civilized Tribes prior to removal of restrictions therefrom, and also any lease of such restricted land made in violation of law before or after the approval of this Act shall be absolutely null and void."

[2] The following regulations were applicable during the year 1920:

Reg. 20 (revised to May 1, 1912):

"All royalties, rents, or payments due under leases which have been or may be approved by the Secretary of the Interior shall be paid to the United States Indian Agent at Union Agency, Muskogee, Okla., or to such other person as may be designated by the Secretary of the Interior, for the benefit of the various lessors, or in cases of minors or incompetents, shall be deposited as hereinafter specified. * * * No royalties on such leases shall be paid by the lessee direct to the lessors or their representatives. * * * * "

Reg. 25 (as amended July 23, 1910, and November 29, 1912):

"All royalties, rents or payments accruing under any lease made for or on behalf of any minor or incompetent shall be held by the United States Indian Superintendent, Union Agency, or such other disbursing officer as may be designated by the Secretary of the Interior, to the credit of the guardian (or curator) of such minor or incompetent and shall be paid to such guardian (or curator) upon voucher executed by him and approved by the Judge of the County (Probate) Court having jurisdiction. * * *

"Provided, however, that the said superintendent, or other officer in charge of the Union Agency, is authorized, in his discretion, where considered for the best interests of any adult, minor, or incompetent lessor, or his or her heirs, for whose account royalties, rents or payments accruing under any lease have been paid to said superintendent, to withhold the disbursement of such royalties, rents or payments, wholly or in part from any such adult, or guardian or curator of any such minor or incompetent, or his or her heirs, until such time or times as the payment thereof is considered best for the benefit of said lessor, or his or her heirs."

paid to said superintendent, to withhold the disbursement of such royalties, rents or payments, wholly or in part from any such adult * * * until such time or times as the payment thereof is considered best for the benefit of said lessor * * *." The authority to withhold "until * * * payment * * * is considered best for the benefit of said lessor" clearly authorizes any payment for the benefit of the lessor, which might have been made by the Secretary, to be made in the sound "discretion" of the Superintendent. In other words, the same and only the same limitation was imposed upon the Superintendent by the Regulations applicable in 1920 as was in 1923 imposed on the Secretary by Section 2 of the statute when construed in connection with the provisions of Section 1.

We have no doubt of the power of the Secretary to delegate to the Superintendent the authority to pass on payments to be made for the benefit of Indians. United States v. Chicago, M. & St. P. R. Co., 218 U.S. 233, 242, 243, 31 S.Ct. 7, 54 L.Ed. 1015; Roxford Knitting Co. v. Moore & Tierney, 2 Cir., 265 F. 177, 190, 11 A.L.R. 1415. It is to be observed that the regulation approved by Mr. Justice Van Devanter in Parker v. Richard, 250 U.S. 235, 237, 238, 240, 39 S.Ct. 442, 63 L.Ed. 954, was either Regulation 25, as amended November 29, 1912, or a substantially similar one.

It is obvious from the proof in the present case and from the facts recited in Barnett v. Equitable Trust Co., D.C.N.Y., 21 F.2d 325, and Mott v. United States, 283 U.S. 747, 51 S.Ct. 642, 75 L.Ed. 1385, that there have been Indians of large wealth derived from natural resources. One of the questions for consideration is whether it is at all likely that Congress intended to require large fortunes to be permanently accumulated for such Indians and to leave them without any right to gratify the ordinary human instinct to make benefactions among charitable, religious and educational institutions in which they were interested. Compulsory accumulation beyond the reasonable needs of an owner seems repugnant to the general policy of the law, as shown by mortmain statutes, and also to the practice of Courts of Chancery whereby excess property of insane persons may be distributed among relatives or institutions that the incompetent would have been likely to make recipients of his bounty. See Farwell v. Commissioner, 2 Cir., 38 F.2d 791; Potter v. Berry, 53 N.J.Eq. 151, 32 A. 259, 34 L.R.A. 297, 51 Am.St.Rep. 626; Matter of Flagler, 248 N.Y. 415, 162 N.E. 471, 59 A.L.R. 649; Matter of Farmers' Loan & Trust Co., 181 App.Div. 642, 168 N.Y.S. 952, affirmed 225 N.Y. 666, 122 N.E. 880; In re Whitaker, 42 Ch.Div. 119; In re Strickland, L.R. 6 Ch. App. 225; Matter of The Earl of Carysfort, 1 Craig & Ph. 76. If a Court of Chancery may authorize such gifts on behalf of its ward it would seem still more reasonable that an Indian of sound mind, who is desirous to bestow his property upon worthy objects, should be allowed to have his will where the public officials having supervision over his affairs find a gift to be within his means and for a worthy object. It was said in United States v. Mott, 10 Cir., 37 F.2d 860, 862, when referring to certain donations which were held to be excessive, that "no one would argue that reasonable sums for those purposes might not be disbursed with the Secretary's consent * * *." In the case at bar only $50,000 was given outright. In making the later gift of $100,000 the Indians only parted with the remainder, reserving for their joint lives the right to income from the trust fund to the extent of 5% which was guaranteed. After the four gifts were made the donors still had fortunes more than adequate for their support. The alternative to permitting donations by Lucy and Suma from their accrued royalties which would benefit the racial and religious group of which they were a part, was either the accumulation which we have already referred to, or a useless and probably demoralizing scale of living from which they could not possibly benefit if any one might. The disposition of substantial sums toward worthy charitable and educational objects seems to us a "benefit" to the Indians within the meaning of the statute and the regulations. Either alternative would narrow the interests and the character of the possessors and would in the long run prove a detriment to them. The officials charged with the duty of safeguarding their property were not parties to acts of spoliation, as was found to be the case in United States v. Mott, 10 Cir., 37 F.2d 860, but were exercising a discretion which seems to us reasonable and within their powers.

The decrees are affirmed, with costs to the appellee.